IN THE MATTER OF RUTH M. BUEHRER, *ET AL.*, DEFENDANTS, CHARGED WITH CONTEMPT OF COURT

Argued September 25 and 26, 1967—Decided December 18, 1967.

*Mr. Donald H. Wollett,* of the New York bar, for appellants (*Mr. H. Lee Sarokin,* of counsel; *Mr. Peter Fishbein, Mr. Robert Schanzer,* and *Messrs. Kaye, Scholer, Fierman, Hays and Handler,* of the New York bar, of counsel; *Messrs. Lasser, Lasser, Sarokin and Hochman,* attorneys).

*Mr. Jacob Fox* argued the cause for respondent.

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendants, who number 30, were convicted in summary proceedings for contempt of court arising out of the violation of an order enjoining a strike by school teachers of the City of Newark. We certified defendants' appeals before argument in the Appellate Division.

Twenty-seven of the defendants pleaded guilty. Three were convicted upon a trial. All but one (Sista) attack the

sentence imposed. Yacenda and Seeley, who stood trial, also complain because they were refused a jury trial. Yacenda adds that his motion for acquittal at the end of the prosecution's case should have been granted. Defendant Sista claims the evidence against him is insufficient.

I

█ We see no merit in the claim of defendant Sista that the evidence is insufficient to establish his guilt beyond a reasonable doubt. He was served on February 9, 1966 with the restraining order in which he was specifically named. The strike began the following morning. He went to the school but would not work. The most that can be said is that he had trouble deciding whether to comply with the court's order, being torn between an awareness of the possible consequences if he did not and what fellow teachers might think of him if he did. His decision to stay out in support of the strike was willful, notwithstanding his claim that he was unable to reach a lawyer for advice. The circumstances defendant presses did not excuse the wrong. They could bear only upon punishment, and the trial court took them into account in imposing only a fine.

█ As to Yacenda, he does not question the sufficiency of the evidence upon the whole case, but says the prosecution failed to establish his guilt in its case. He claims there was no proof that he knew of the restraining order prior to conduct violative of its terms. On February 9, the day before the strike, the principal at Yacenda's school arranged for the distribution to each teacher of a written notice of the restraining order with a caution to comply. The vice-principal, who did not testify because of illness, made the distribution with the aid of some students. Yacenda was at school that day, and none of the notices was returned as undelivered. The next day Yacenda telephoned that he would not come in because of illness, but he appeared in the picket line, and after being served there with a

copy of the order, he continued to picket for some 10 or 15 minutes. Although it was about 10:00 A. M. when he was thus served, he did not seek to work that day, and the following day he again reported illness. On February 15 he filed a certificate in which he claimed personal illness on the 11th and expressly disavowed illness on the 10th.

The foregoing proof, all in the State's case, was sufficient to support an inference that Yacenda received notice of the order on February 9, that he continued to picket even after service of the order on February 10, and that he refused to work on both the 10th and 11th in defiance of the order. *State v. Fiorello*, 36 *N. J.* 80, *pp.* 86–91 (1961), cert. denied, 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed.* 2*d* 396 (1962).

## II

Each defendant, other than Sista, was sentenced to a term in jail, the execution of the jail sentence was suspended, and each was placed on probation for one year, the minimum period of probation permitted by statute. *N. J. S. A.* 2A: 168–1. The suspended jail term was 90 days as to three defendants, 60 days as to three more, and 30 days as to the others. Three were fined $1,000 and the others $500. Defendants attack only the imposition of probation.

The trial court was not sure that anything less than actual imprisonment would suffice to protect the public interest. The strike here involved was the second to hit the Newark school system within a period of nine or ten weeks. The Newark Teachers Association (N. T. A.) had bested a rival organization, the Newark Teachers Union (N.T.U.), in a representative election in December 1964. On July 27, 1965 the Board of Education entered into a written agreement with N.T.A. to run for one year but subject to reopening at N.T.A.'s option on or after December 1, 1965 for negotiations as to teacher salaries and certain other matters bearing upon the Board's budget for 1966-1967. N.T.A. chose to reopen on December 1, 1965 where-

upon N.T.U., claiming there should be another representative election, called a strike for December 2, 1965. A restraining order was obtained, and the order being violated, contempt proceedings ensued in which, on pleas of guilty, fines were imposed. Despite those convictions, the membership of N.T.A. on January 13, 1966 resolved to impose "sanctions" in support of their demands upon the Board, and called for a membership meeting on January 27, 1966 "to hear reports from the Negotiation Team and Strike Strategy Committee." On February 2 and 3, by a vote of 1,712 out of 2,498, the membership voted to strike on February 10 if an "acceptable economic package" was not agreed to by the Board by that date. On February 9 the court issued the temporary restraining order here involved. Notwithstanding the order, more than 1,700 out of 3,500 did not report for work on February 10 and on the following day more than 1,800 were absent. When the strike ended, the president of N.T.A. publicly proclaimed that "The purpose of the strike has been served."

Thus there was a second illegal strike by Newark teachers within a short span, demonstrating that the prospect of a fine, the punishment imposed in connection with the first strike, was not enough to insure compliance with law. It is understandable that the trial court concluded that sterner measures were needed in the public interest. Defendants say the trial court gave no weight to their claim that they struck and defied the order because of a frustration born of an inability to obtain for the school system what they believed it had to have. The prosecution disputes this claim of high purpose. The trial court of course did not evaluate the teachers' demands upon the Board, and neither do we. The notion that some higher right justifies concerted defiance of law can have no role in the courtroom. It cannot excuse; on the contrary, it emphasizes the deliberate nature of the violation. Nor can it meliorate the wrong, especially when the plea comes from public servants who should set the good example.

█ Being of the view that a fine would be inadequate and being reluctant to send defendants to jail, the trial court took the intermediate course of a suspended jail sentence with probation and a fine. Defendants say the trial court intended the sentence to be punitive and thereby departed from the thesis that probation is meant to rehabilitate. The argument assumes that punishment and rehabilitation are somehow incompatible. Of course they are not. Even a lengthy jail term is imposed with the hope that it will rehabilitate. That hope is implicit in the requirement that all sentences to state prison shall consist of a maximum and a minimum term, *N. J. S. A.* 2A:164–17, in the indeterminate sentence, and indeed in the parole structure itself. Punishment and rehabilitation are not antagonists.

█ Probation assumes the offender can be rehabilitated without serving the suspended jail sentence. But this is not to say that probation is meant to be painless. Probation has an inherent sting, and restrictions upon the freedom of the probationer are realistically punitive in quality.[1] Hence the trial court did not err in recognizing that probation involves punishment. Nor can it be maintained that probation may not be ordered to the end that others may be deterred from lawlessness. See Herlands, "When and How Should a Sentencing Judge Use Probation?" 35 *F. R. D.* 487, 492–493 (1964). Probation is meant to serve the overall public interest as well as the good of the immediate offender. Thus *N. J. S. A.* 2A:168–1 authorizes the use of probation "[w]hen it shall appear that the best interests of the public as well as of the defendant will be subserved thereby."

---

[1] Some believe that actual confinement to jail for a limited period is itself an appropriate condition of probation. See *Model Penal Code* § 6.02(3)(b); § 301.1(3) (Proposed Official Draft, 1962); 67 *Colum. L. Rev.* 181, 184 (1967). Our statute in effect permits that approach with respect to county jail sentences since it authorizes a judgment that a part of the jail sentence be served and be followed by probation. *N. J. S. A.* 2A:164–16.

■ Hence we see no basis for complaint that the trial court, aware that fines imposed after the first strike did not deter these defendants, and unwilling to send them to jail if lesser measures might do, chose to place defendants on probation, with the hope and intent to convince these defendants of the error of their thinking and to deter others who might thereafter be inclined to ignore orders of a court in these matters. Indeed, it would hardly serve these defendants to say that probation may not be employed to serve both ends, for the alternative would have been an unsuspended jail sentence.

Next defendants complain of the conditions of the probation. In sentencing each defendant the court stated the defendant was placed on probation "subject to your compliance with the standard conditions of probation which have been adopted by the Court and are on file with the clerk of the Court," with the added special condition that the defendant refrain from illegal strike activity and pay the fine within 30 days. The court further said a probation officer "will explain to you all the rules of probation as well as the consequences of failure to comply with them" and added that "Incidentally, one of the rules of probation is that you report in person weekly to your probation officer."

The standard conditions of probation to which the trial court referred were adopted by the Essex County Court judges. These conditions deal with the sundry areas of restriction contemplated by *N. J. S. A.* 2A:168–2. These conditions presumably were adopted in a standard form to achieve uniformity of expression and to permit their incorporation into the sentence without a lengthy recitation which a defendant could not very well absorb in a process of oral delivery. See *United States v. Markovich,* 348 *F. 2d* 238, 240 (2 *Cir.* 1965); *Manning v. United States,* 161 *F. 2d* 827, 829 (5 *Cir.* 1947), certification denied, 332 *U. S.* 792, 68 *S. Ct.* 102, 92 *L. Ed.* 374 (1947); *Whitehead v. United States,* 155 *F. 2d* 460, 462 (6 *Cir.* 1946), certification denied, 329 *U. S.* 747, 67 *S. Ct.* 66, 91 *L. Ed.* 644

(1946). The standard conditions of probation are delivered in printed form to the defendant upon sentence, and he signs a receipt.

█ Defendants contend that some of the standard conditions are inappropriate. Actually their primary target is the condition for reporting, which, however, we think is appropriate to achieving the objectives discussed above. But some of the remaining standard conditions do seem unnecessary. *N. J. S. A.* 2A:168–2 intends that the sentencing judge decide what restrictions shall be imposed. As we have said, the formulation of a standard set is a reasonable approach, but the responsibility remains the court's to decide in each case if all shall be applied. No doubt it is difficult to know in advance precisely what will be needed, and hence the cited statute expressly provides that the court "may, at any time, modify the conditions of probation." We are informed that the probation department here concerned has printed forms for easy application to the court for modification of the terms. Here defendants, after receiving the standard conditions, moved for modification. We gather that the motion was not heard because in the interim defendants had filed a notice of appeal, which was deemed to deprive the trial court of jurisdiction to act. The motion may be pressed before the trial court after our mandate issues.

## III

As noted earlier, defendants Yacenda and Seeley were refused a trial by jury. *R. R.* 4:87–4 provides "The court in its discretion may try the [contempt] charge without a jury but this rule shall not supersede any statutory right to trial by jury." There is no statutory right to trial by jury with respect to the offense here involved. Defendants do not say there is, but they urge it is a misuse of discretion to deny a jury trial except "where the offense, judged by the totality of the circumstances, is petty and the penalty imposed is limited to a small fine."

512

█ Defendants refer to decisions of the United States Supreme Court which deal with the right of trial by jury in federal prosecutions for contempt. *Cheff v. Schnackenberg,* 384 *U. S.* 373, 86 *S. Ct.* 1523, 16 *L. Ed.* 2d 629 (1966); *Shillitani v. United States,* 384 *U. S.* 364, 86 *S. Ct.* 1531, 16 *L. Ed.* 2d 622 (1966); *United States v. Barnett,* 376 *U. S.* 681, 84 *S. Ct.* 984, 12 *L. Ed.* 2d 23 (1964); *Green v. United States,* 356 *U. S.* 165, 78 *S. Ct.* 632, 2 *L. Ed.* 2d 672 (1958). Defendants do not say the jury provisions of the United States Constitution apply to the States.[2] Nor do defendants suggest the State Constitution assures them a right to trial by jury. It has long been settled that certain contempts may be prosecuted summarily notwithstanding the provisions of the State Constitution relating to trial by jury, now *Art.* I, ¶ 9, and indictment, now *Art.* I, ¶ 8. *In re Boyd,* 36 *N. J.* 285 (1962); *State v. Doty,* 32 *N. J. L.* 403 (*Sup. Ct.* 1868). The United States Supreme Court maintains the same view of the Federal Constitution, as its decisions just cited reveal. Rather those cases are relevant only insofar as they culminated, in the plurality opinion in *Cheff v. Schnackenberg,* in a ruling, made without constitutional compulsion, limiting to six months the jail term which may be imposed by a federal court upon a summary conviction for contempt.

█ Of course, the suspended jail terms here involved are well within the outer limits laid down in *Cheff v. Schnackenberg* for federal contempt prosecutions. Defendants ask that we go further, and hold that our rule of court means that if the contempt would warrant anything more than a

---

[2] As of now, the provisions of the Federal Constitution relating to trial by jury (*Art.* III, § 2; Sixth Amendment) and to indictment by a grand jury (Fifth Amendment) do not apply to the States. See, *Palko v. State of Connecticut,* 302 *U. S.* 319, 323–324, 58 *S. Ct.* 149, 82 *L. Ed.* 288, 291 (1937). There is pending before the United States Supreme Court the case of *People v. Bloom,* 35 *Ill.* 2d 255, 220 *N. E.* 2d 475 (*Sup. Ct.* 1966), *cert.* granted, 386 *U. S.* 1003, 87 *S. Ct.* 1346, 18 *L. Ed.* 2d 431 (1967), which involves a two-year jail term imposed on a conviction for contempt without jury trial.

small fine,[3] a proper exercise of discretion requires that a request for trial by jury be honored. We intended no such limitation when we adopted the rule, and we are not persuaded to ingraft it by construction. The matter rests in the trial court's discretion. We see no reason to say it was misused.

Although not essential for a decision in this case, the current of events suggests we decide now a question we heretofore expressly reserved, whether our State Constitution limits the punishment in a summary prosecution for contempt, and thereupon, whether the sentences here imposed exceed those limits. To that end it is well to review briefly the history of contempt and then to weigh whether the reason for the summary contempt power precludes applying to that power the constitutional limits upon punishment applicable to other offenses prosecuted without indictment and without petit jury.

A.

There is no doubt that at common law a contempt of court could be prosecuted in the regular course of criminal procedure and that a contempt today may be prosecuted as a crime under the provision of *N. J. S. A.* 2A:85–1 that "all other offenses of an indictable nature at common law, and not otherwise expressly provided for by statute, are misdemeanors." *Dept. of Health v. Roselle,* 34 *N. J.* 331, 340 (1961). Nor has it been doubted that some contempts may nonetheless be punished in a summary proceeding, *i. e.,* without indictment or trial by jury. Rather the debate has been over the reach of the summary power, and over the

---

[3] Defendants also contend the Legislature long ago limited the punishment for contempt to a fine of $50. Reference is made to "An Act respecting the court of chancery" passed on June 13, 1799. That statute was held in *Frank v. Herold,* 64 *N. J. Eq.* 371 (*E. & A.* 1902), appeal dismissed, 191 *U. S.* 558, 24 *S. Ct.* 844, 48 *L. Ed.* 302 (1903), to relate to a proceeding for further relief of a party to the cause and not to a proceeding to punish for contempt. We also so held as to the successor statute, *N. J. S. A.* 2A:10–5, in *Dept. of Health v. Roselle,* 34 *N. J.* 331, 345-346 (1961).

feasibility of other safeguards against the potential for arbitrariness inherent in a process in which the court is complainant, prosecutor, judge and executioner.

The contempt power came under close scrutiny at the turn of the 18th Century. Several judges were impeached for claiming the power to deal summarily with out-of-court criticism of judicial behavior. The most celebrated case involved a federal judge named Peck, who was impeached by a vote of 123 to 49 and escaped conviction by a vote of 21 to 22. Judge Peck was acquitted on January 31, 1831, and on the following day the House unanimously charged its Committee on the Judiciary to examine the matter. The Committee brought in a bill prepared by James Buchanan, who had prosecuted Peck. The House passed the measure on February 28, and on March 2 it received the approval of the Senate. It was entitled "An Act *declaratory* of the law concerning contempts of court" (4 *Stat.* 487) (emphasis is ours). Frankfurter and Landis, "Power of Congress over Procedure in Criminal Contempts in 'Inferior' Federal Courts," 37 *Harv. L. Rev.* 1010, *pp.* 1023–1028 (1924). "So deeply did the Peck case stir the country that State after State copied the new Federal law." Frankfurter and Landis, *supra, p.* 1027. Section 1 of the federal act provided:

"* * * That the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehavior of any person or persons in the presence of said courts, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts."

Section 2 provided for the trial of other offenses relating to the judiciary by the ordinary criminal procedure.[4]

---

[4] For present federal statutory provisions, see 18 *U. S. C. A.* §§ 401, 402.

Thus, close upon the adoption of the Federal Constitution, the Congress enacted a statute which reflected upon the scope of the summary contempt power and upon its compatibility with organic law. A respected British authority found the federal statute to be an accurate statement of the summary power as of the time of the American Revolution. *Fox, History of Contempt of Court, p.* 208 (1927).

In our State the Legislature did not act until almost a century later when, in response to summary prosecution of an out-of-court criticism of a court, it adopted a statute expressly modeled after the Congressional Act of March 2, 1831, listing the same three categories of matters in which the summary power may be exercised: (1) misbehavior in the actual presence of the court; (2) misbehavior of an officer of the court in his official transactions; and (3) disobedience or resistance to any order or process of the court. *N. J. S. A.* 2A:10–1; *Dept. of Health v. Roselle, supra,* 34 *N. J.,* at *p.* 341.

We are here concerned with the third category—disobedience of a court order. The statute embodies a judgment which has endured for centuries that the power to deal by a summary process with defiance of court orders is necessary, for the reason that without the prospect of prompt prosecution, the prevailing litigant could be delayed in the enjoyment of his rights or even be denied them in times and places in which those rights are in low popular regard.

But since the summary power lends itself to arbitrariness, it should be hemmed in by measures consistent with its mission. To that end, our rules embody sundry restraints. The judge whose order was allegedly breached may not hear the charge unless the defendant consents; the contempt process may be instituted only by the court, lest a litigant turn it to private gain; the defendant shall be informed plainly that the proceeding is penal as distinguished from one for the further relief of a litigant; the penal charge may not be tried with a litigant's appli-

cation for further relief unless the defendant consents; a conviction is reviewable upon appeal both upon the law and the facts, and the appellate court shall give such judgment as it shall deem just. The presumption of innocence of course obtains, and the burden of the prosecution is to prove guilt beyond a reasonable doubt. Thus the defendant is afforded all the rights of one charged with crime except the right to indictment and to trial by jury. See *R. R.* 4:87–1 to 5; *R. R.* 1:5–2. *Dept. of Health v. Roselle, supra,* 34 *N. J.* 331; *In re Carlon,* 48 *N. J.* 9, *pp.* 19–23 (1966).

The question now before us is whether the summary contempt process can be reconciled with our basic constitutional treatment of penal offenses by limiting the consequences of a summary conviction to those which follow upon a conviction of other offenses triable without indictment and without jury. If that reconciliation can be made without impairing the efficacy of the summary contempt power, the final constitutional anomaly of the summary contempt process will disappear.

Although our cases not infrequently refer to the summary proceeding as "criminal," there has been scant discussion of the precise impact of a conviction. No case, for example, intimates that a person fined $10 for contempt thereby acquires a "criminal record" with the stigma and disabilities which our statutes attribute to a conviction for "crime."[5] In *In re Maltera,* 34 *N. J.* 259, 272 (1961), we suggested that a summary conviction for contempt might carry no such aftermath, saying with respect to the prosecution of contempt as a crime:

"* * * But even there, there is another side to the coin: a prosecution for crime may be too heavy a hand to lay upon the offender.

---

[5] Thus *N. J. S. A.* 2A:81–12 provides that conviction of crime may be shown to affect the credibility of a witness. Such a conviction disqualifies a person for jury service, *N. J. S. A.* 2A:69–1; affects eligibility for civil service, *N. J. S. A.* 11:9–6 and 11:23–2; and leads to forfeiture of public office or position, *N. J. S. A.* 2A:135–9.

Despite its autocratic capacity, the contempt process more easily permits a tempering of consequences when the misconduct should be equated with a petty offense as that term is understood in the legal art."

And shortly thereafter, in *In re Boyd, supra,* 36 *N. J.* 285, in which we reiterated that the summary prosecution for contempt did not violate the constitutional provisions for indictment and trial by jury, we expressly raised the question we are now discussing (*p.* 287):

"\* \* \* We need not consider whether punishment beyond that constitutionally permissible for offenses below the grade of crime may be imposed for contempt if the constitutional guarantees here sought to be invoked are not afforded."

## B.

 In our State "crimes" are called "misdemeanors" or "high misdemeanors."[6] Unless otherwise provided, a misdemeanor is punishable by a maximum fine of $1,000 or by imprisonment for not more than three years, or both, *N. J. S. A.* 2A:85–7, and a high misdemeanor is punishable by a maximum fine of $2,000, or by imprisonment for not more than seven years, or both, *N. J. S. A.* 2A:85–6. These offenses are within our constitutional guarantees of indictment and trial by jury.

 Below the grade of crime are lesser offenses, none of which carries the stigma or the disabilities which follow upon a conviction of crime, *State v. Maier,* 13 *N. J.* 235, *pp.* 250–251 (1953); *State v. Block,* 119 *N. J. L.* 277, 282 (*Sup. Ct.* 1938), affirmed, 121 *N. J. L.* 73 (*E. & A.* 1938); *Huff v. C. W. Goddard Coal, etc., Co.,* 106 *N. J. L.* 19, 21 (*Sup. Ct.* 1930), or authorized maximum penalties as severe as those which may be imposed upon a conviction for crime. Among the lesser offenses are "disorderly person" offenses which

---

[6] Murder is an exception with respect to this terminology. The statute labels the offense as "murder" rather than a grade of misdemeanor. *N. J. S. A.* 2A:113–1.

cover a wide gamut of misbehavior, see *N. J. S. A.* 2A:170-1, *et seq.*, and which, unless otherwise provided, carry a maximum of one year in jail or a $1,000 fine or both, *N. J. S. A.* 2A:169-4. In addition there are other statutes providing for lesser offenses with still lower limits on punishment, such as the Motor Vehicle Act, and of course there are municipal ordinances as well.

 All of the offenses below the grade of crime come within the generic category of "petty offenses," not to suggest thereby that the authorized punishments are trivial but rather to say that because the consequences of a conviction are limited, these offenses are beyond the concept of "crime" within the intent of our State Constitution's provisions for indictment and trial by jury. That offenses below the grade of crime may thus be tried without indictment and petit jury has long been the law of our State. See the comprehensive discussion in *State v. Maier, supra,* 13 *N. J.,* at *p.* 260, *et seq.* The United States Supreme Court takes the same view of the Federal Constitution, finding petty federal offenses to be beyond its guaranty of jury trial. *Cheff v. Schnackenberg, supra,* 384 *U. S.* 373, 86 *S. Ct.* 1523, 16 *L. Ed. 2d* 629; *District of Columbia v. Clawans,* 300 *U. S.* 617, 57 *S. Ct.* 660, 81 *L. Ed.* 843 (1937). So generally do other jurisdictions. Annotation, 75 *L. Ed.* 177 (1931); Frankfurter and Corcoran, "Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury," 39 *Harv. L. Rev.* 917 (1926); 31 *Am. Jur., Jury,* §§ 34, 36, *pp.* 40-41 (1958). However incongruous the results may be, the constitutional provisions have been read only to continue the right to jury trial in situations in which the right was established when the constitutions were adopted,[7] and there-

---

[7] Thus although there is a constitutional right to trial by jury in a common-law civil action no matter how little is involved, there is no right to jury as to equitable issues no matter how large the stakes; nor in matrimonial or domestic relations proceedings; nor ordinarily in lieu of prerogative writ; nor in proceedings before administrative agencies, despite such matters of direct monetary moment as workmen's compensation claims. With respect to criminal

fore to be inapplicable to "petty offenses" since offenses so classifiable were tried summarily at that time.

We have not passed upon the outer limits of punishment with respect to offenses below the grade of crime. As stated above, the Legislature authorized a year's imprisonment and a fine of $1,000 for a disorderly persons offense. The amount of the fine presents no problem. Whether a jail term for a year exceeds constitutional limits may be debatable. No case in our State has dealt with that question. An authorized maximum of six months has been upheld. In *Katz v. Eldredge,* 97 *N. J. L.* 123, 157 (*E. & A.* 1922), a majority of the court held that a statute authorizing a six months' jail term is valid, and in *State, Klinges v. Court of Common Pleas,* 4 *N. J. Misc.* 7, 130 *A.* 601 (*Sup. Ct.* 1925), a statute providing for a minimum term of one month and a maximum of six was sustained. A maximum of six months also has substantial precedent elsewhere. See *District of Columbia v. Clawans, supra,* 300 *U. S.* 617, 626, 57 *S. Ct.* 660, 81 *L. Ed.* 843, 847. We note that the Congress has defined a petty offense as any offense for which the penalty does not exceed six months or a fine of $500 or both. 18 *U. S. C. A.* § 1.

If six months in jail and a fine of $1,000 would adequately support the summary contempt power, we need not decide whether an offense punishable more severely would be a petty offense within our constitutional doctrine. We think

matters, the right does not exist in causes triable by courts-martial or military commissions even though the penalty may be death, *Ex Parte Quirin,* 317 *U. S.* 1, 63 *S. Ct.* 1, 87 *L. Ed.* 3 (1943) ; *Whelchel v. McDonald,* 340 *U. S.* 122, 71 *S. Ct.* 146, 95 *L. Ed.* 141 (1950), re-hearing denied, 340 *U. S.* 923, 71 *S. Ct.* 356, 95 *L. Ed.* 666 (1951) ; *Reid v. Covert,* 354 *U. S.* 1, 77 *S. Ct.* 1222, 1 *L. Ed. 2d* 1148 (1955) ; nor does the right exist in juvenile court proceedings, *State v. Maier, supra,* 13 *N. J.* at 277; and our present State Constitution expressly empowers the Legislature to authorize the trial of the issue of mental competency without a jury, *Art.* I, ¶ 9. Matters, judicial and *quasi*-judicial, civil and punitive, now triable in this country without a jury, must number annually in the millions.

the suggested limits would suffice. Experience so indicates, since except for *In re Hendricks,* 113 *N. J. Eq.* 93 *(E. & A.* 1933), in which a three-year term was imposed upon a court-appointed receiver who embezzled $149,000, and *In re Kronyak,* 54 *N. J. Super.* 528 *(App. Div.* 1959), in which a sentence for a year and a half was imposed but vacated for other reasons in a post-conviction proceeding, the jail terms for contempt in reported cases in our State have been well within a six-month limit.[8] As we noted earlier, the plurality opinion in *Cheff v. Schnackenberg, supra,* 384 *U. S.,* at *p.* 380, 86 *S. Ct.* 1523, 16 *L. Ed. 2d,* at *p.* 634, concludes, in an exercise of the Court's supervisory authority including the power to review sentences in contempt, that no sentence in excess of six months should thereafter be imposed in a summary prosecution for contempt. Accordingly we accept that limitation upon the jail term with respect to a contempt prosecuted summarily. For the rare case in which a greater punishment may be needed in the public interest, authority will remain to refer the matter to the grand jury for prosecution as a crime in violation of *N. J. S. A.* 2A:85–1.

A further question suggests itself, whether thus to permit a contempt to be prosecuted either as a petty offense

---

[8] A survey discloses the following jail sentences:

30 days or less: *McAllister v. McAllister,* 95 *N. J. Super.* 426 *(App. Div.* 1967)—30 days; *In re Boiardo,* 34 *N. J.* 599 (1961)—30 days; *State v. Gussman,* 34 *N. J. Super.* 408 *(App. Div.* 1955)—10 days; *Swanson v. Swanson,* 8 *N. J.* 169 (1951)—30 days: *In re Baer,* 13 *N. J. Misc.* 148 *(Sup. Ct.* 1935)—30 days, judgment reversed on other grounds; *Backer v. A. B. & B. Realty Co.,* 107 *N. J. Eq.* 246 *(Ch.* 1930)—30 days; *Edwards v. Edwards,* 87 *N. J. Eq.* 546 *(Ch.* 1917)—10 days; *In re Verdon,* 89 *N. J. L.* 16 *(Sup. Ct.* 1916)— 30 days, judgment reversed on other grounds, 90 *N. J. L.* 494 *(E. & A.* 1917) ; *Rhinehart v. Lance,* 43 *N. J. L.* 311 *(Sup. Ct.* 1881)—10 days, judgment reversed on other grounds; *In re Kerrigan,* 33 *N. J. L.* 344 *(Sup. Ct.* 1869)—15 days, judgment reversed on other grounds.

60 days: *In re Boyd,* 36 *N. J.* 285 (1962) ; *Sarner v. Sarner,* 28 *N. J.* 519 (1959), *cert.* denied, 359 *U. S.* 533, 79 *S. Ct.* 1137, 3 *L. Ed. 2d* 1028 (1959), rehearing denied, 360 *U. S.* 940, 79 *S. Ct.* 1446, 3 *L. Ed. 2d* 1552 (1959), rehearing denied, 361 *U. S.* 941, 80 *S. Ct.* 364, 4 *L. Ed. 2d* 361 (1960) ; *Whippany Paperboard Co., Inc. v.*

or as a crime will deny equal protection of the law because of the different consequences which follow a conviction. The issue could not be raised, without great strain, by an individual prosecuted for the lesser offense, but a defendant indicted for the crime of contempt could urge the point.

It is of course commonplace that a prosecutor need not pursue the maximum charge a factual complex could sustain. Discretion must repose somewhere to avoid the injustice of blind rigidity. The situation before us is, however, distinguishable in that whereas ordinarily the prosecutor chooses from among offenses having different constituent elements, here the offense of contempt is single in its definition. Nonetheless we see no intolerable threat to the ideal of equality before the law. The aphorism that we are a government of law and not of men does not mean that we are a government without men. There are many areas of uncharted discretion in which the final recourse must be to the judgment of men. How much bail? What, albeit within stated limits, should be the sentence? Should it be suspended? Is there enough evidence to go to a jury, or is the verdict against its weight? These and many other problems defy ready measurement, and this being so, they must be committed to the judgment and integrity of men. And so here,

---

*Local No.* 301, etc., *C.I.O.*, 11 *N. J.* 153 (1952) ; *In re Caruba*, 139 *N. J. Eq.* 404 (*Ch.* 1947), affirmed, 140 *N. J. Eq.* 563 (*E. & A.* 1947), petition denied, 142 *N. J. Eq.* 358 (*Ch.* 1948), cert. denied, 335 *U. S.* 846, 69 *S. Ct.* 69, 93 *L. Ed.* 396 (1948) ; *Appeal of Frank*, 135 *N. J. L.* 429 (*Sup. Ct.* 1947) ; *Frank v. Herold*, 64 *N. J. Eq.* 371 (*E. & A.* 1902), appeal dismissed, 151 *U. S.* 558, 24 *S. Ct.* 844, 48 *L. Ed.* 302 (1903).

Three months: *Staley v. South Jersey Realty Co.*, 83 *N. J. Eq.* 300 (*E. & A.* 1914), judgment reversed on other grounds.

Four months: *Harbor Tank Storage Co. v. De Angelis*, 85 *N. J. Super.* 92 (*App. Div.* 1964), judgment reversed on other grounds and reversal affirmed, 45 *N. J.* 539 (1965) ; *Van Sweringen v. Van Sweringen*, 34 *N. J. Super.* 394 (*App. Div.* 1955), judgment reversed on other grounds, 22 *N. J.* 440 (1956).

Six months: *In re Malisse*, 66 *N. J. Super.* 195 (*App. Div.* 1961), judgment reversed on other grounds.

it not being feasible to catalogue the circumstances in which the criminal process would be meet, the matter may fairly be left to a prosecutorial discretion in the court.[9]

To recapitulate: (1) a contempt, in the court's discretion, may be prosecuted summarily, *i. e.*, without indictment and without trial by jury as provided in *R. R.* 4:87–1 to 4, or as a crime under *N. J. S. A.* 2A:85–1; (2) in a summary prosecution for contempt the punishment may not exceed six months' imprisonment or a fine of $1,000 or both, subject to the provisions for probation in *N. J. S. A.* 2A:168–1 *et seq.;* and (3) a summary conviction for contempt does not constitute a conviction within the meaning of statutes imposing disability or disqualification or otherwise discrediting an individual because of a prior conviction for "crime."

The sentences imposed in the matters before us are well within these limits, and we concur in them.

The judgments are affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN.—6.

*For reversal*—None.

---

[9] Comparable is the discretion vested in a court to decide whether a juvenile offender shall be dealt with in regular criminal process, as to which the test is not the precise identity of the wrong but whether the public interest may require the criminal approach because of the heinous quality of the event. See *State v. Van Buren*, 29 *N. J.* 548 (1959) ; *cf. Kent v. United States*, 383 *U. S.* 541, 86 *S. Ct.* 1045, 16 *L. Ed.* 2d 84 (1966). So also *Re Gault*, 387 *U. S.* 1, 87 *S. Ct.* 1428, 18 *L. Ed.* 2d 527 (1967), insofar as it makes the right to counsel depend upon whether the delinquency proceedings "may result in commitment to an institution in which the juvenile's freedom is curtailed" (387 *U. S. p.* 41, 87 *S. Ct. p.* 1451, 18 *L. Ed.* 2d, *p.* 554), may require an advance evaluation of the delinquency charge, not on the basis of the nature of the act, but upon an assessment as to whether the total circumstances may require commitment in the interest of the juvenile and the public.