185 N.J. Super. 385 (1982)
448 A.2d 1037
STATE OF NEW JERSEY, PLAINTIFF,
v.
FRECH FUNERAL HOME, DEFENDANT.
Superior Court of New Jersey, Law Division Bergen County.
Decided March 3, 1982.
*387 Michael Vukcevich, Deputy Attorney General for the State (James R. Zazzali, Attorney General of New Jersey, attorney).
Charles J. Mysak for defendant.
MINUSKIN, J.S.C.
Pursuant to R. 3:23-8(a)(3), the State appeals from an order of the Dumont Municipal Court dismissing its complaint against Frech Funeral Home, Inc. for its failure to pay a trainee the overtime mandated by N.J.S.A. 34:11-56a4. The novel legal question raised by this appeal is whether, for purposes of N.J.S.A. 34:11-56a4, a mortician's trainee is employed in a bona fide professional capacity and thereby excepted from the provisions of that statute.
Before reaching the substantive issue of statutory construction, the court must address two threshold questions. First is the determination of the applicable statute of limitations, and second is whether defendant is entitled to a trial by jury. The resolution of both these questions depends upon whether a violation of the overtime statute is a disorderly persons offense under the New Jersey Code of Criminal Justice, N.J.S.A. 2C:1-1 et seq., or a misdemeanor under N.J.S.A. 2A:1-1 et seq.
The factual context in which all of these questions are raised is as follows. On January 26, 1981 the Department of Labor and Industry, Office of Wage and Hour Compliance, filed a *388 79-count complaint in the Dumont Municipal Court against Frech Funeral Home, Inc. (Frech), alleging that it violated N.J.S.A. 34:11-56a4[1] by failing to pay its trainee Ken Barker, 1 1/2 times his regular hourly rate for each hour in excess of 40 hours, during the entire period of Barker's employment. Barker's employment lasted from the week ending August 5, 1977 to the week ending June 7, 1979. Notwithstanding the admission by defendant of the factual allegations made by the State, defendant asserts that it is not guilty of a misdemeanor as provided in N.J.S.A. 34:11-56a22.
The Municipal Court, without addressing the merits, dismissed the complaints as time-barred. The judge regarded the one-year statute of limitations under N.J.S.A. 2C:1-6 b(2) as controling, rather than the five-year statute of limitations under N.J.S.A. 2A:159-2. The State has appealed.

I. Statute of Limitations
Defendant relies on N.J.S.A. 2C:1-4c, which states in pertinent part that
Insofar as any provision outside the code [New Jersey Code of Criminal Justice] declares an offense to be a misdemeanor when such offense specifically provides a maximum penalty of 6 months imprisonment or less, whether or not in combination with a fine, such provision shall constitute a disorderly persons offense.
Based on this provision of the Code, defendant argues that since the maximum penalty for violation of N.J.S.A. 34:11-56a4 does not exceed six months, the offense charged should be viewed as a disorderly persons offense subject to the concomitant *389 one-year statute of limitations set forth in N.J.S.A. 2C:1-6 b(2). Thus, it contends that the complaints filed January 26, 1981 must be dismissed since the date of the last alleged illegal activity was June 7, 1979.
The underlying flaw in this analysis is that it ignores the Code's threshold rules of construction as provided in N.J.S.A. 2C:1-1 b, which states that
... the code does not apply to offenses committed prior to its effective date [September 1, 1979] and prosecutions and dispositions for such offenses shall be governed by the prior law, which is continued in effect for that purpose, as if this code were not in force. For the purpose of this section, an offense was committed after the effective date of the code if any of the elements of the offense occurred subsequent thereto.
See, State v. Mraovitch, 176 N.J. Super. 141, 145 (App.Div. 1980); State v. Kent, 173 N.J. Super. 215, 221 (App.Div. 1980); State v. Glass, 171 N.J. Super. 157, 159-160 (Law Div. 1979).
In arguing the inapplicability of N.J.S.A. 2C:1-1 b defendant relies on an exception to that rule as provided in N.J.S.A. 2C:1-1 c(1) which states:
In any case pending on or initiated after the effective date of the code involving an offense committed prior to such date:
(1) The procedural provisions of the Code shall govern, insofar as they are justly applicable and their application does not introduce confusion or delay. [emphasis supplied]
Defendant argues that the statute of limitations is a procedural rather than a substantive provision and therefore the code's limitation applies. Thus, the issue is whether in the context of the Code's applicability to pre-Code offenses, the statute of limitations is substantive or procedural.
The substantive-procedural dichotomy is traditionally difficult to define. The New Jersey Supreme Court notes in Busik v. Levine, 63 N.J. 351 (1973), that
... it is simplistic to assume that all law is divided neatly between "substance" and "procedure." A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account ... As said in Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8, 16-17 (1965), "The line between `substance' and `procedure' shifts as the legal context changes. Each implies different variables depending upon the particular problem for which it is used.'" One context is conflict of laws; another is retrospective *390 application of statutes; and a third is law-making, [power of the Supreme Court] the subject at hand. [at 364-365; emphasis supplied]
The categorization of the statute of limitations is an endeavor not only peculiarly subject to a particular legal context but is also subject to shifts in legal theory within that context. For instance, as noted in Busik, supra, it was the general rule that the statute of limitations in the context of a conflict of laws problem should be regarded as a procedural issue and, for that reason, governed by the forum's law. Bournias v. Atlantic Maritime Co., Ltd., 220 F.2d 152 (2 Cir.1955); Marshall v. George M. Brewster & Sons, Inc., 37 N.J. 176, 179-182 (1962); See Restatement, Conflict of Laws 2d, § 142 (1971). However, in Heavner v. Uniroyal, Inc., 63 N.J. 130 (1973), a products liability case, the court rejected the general rule.[2]See Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc., 58 Wis.2d 193, 206 N.W.2d 414 (Sup.Ct. 1973).
The conflicts of law context is not dispositive for criminal law. In State in the Interest of B.H., 112 N.J. Super. 1 (J. & D.R.Ct. 1970), Judge Rosenberg stated that the
... tolling of the statute of limitations is a matter of defense. [Citations omitted] ... [It] is not a procedural defense ... it is substantive and jurisdictional. 22 C.J.S., Criminal Law, § 223 at 574; [and see] United States v. Eliopoulos, 45 F. Supp. 777 (D.C.N.J. 1942); Moore v. State, 43 N.J.L. 203 (E. & A. 1881); In re Pillo, 11 N.J. 8 (1952). [112 N.J. Super. at 3, 4
The Code clearly refers to the statute of limitations as a defense. N.J.S.A. 2C:1-14h(3)(a). The fact that this defense is *391 substantive in nature has been reinforced by the recent decisions of State v. Molnar, 81 N.J. 475, 488 (1980), and State v. Galiyano, 178 N.J. Super. 393, 396 (App.Div. 1981), certif. den. 87 N.J. 424 (1981), which held that for the purposes of N.J.S.A. 2C:1-1(a)(1) all defenses are substantive.
Accordingly, although the five-year statute of limitations is considerably harsher than the one-year limitation of the Code, the court is bound to conclude that the Code's statute of limitations is not procedural and may not therefore be applied to offenses committed prior to the effective date of the Code.

II. Right to Trial by Jury
The second threshold issue is whether defendant has the constitutional right to a trial by jury despite the fact that R. 3:23-8(a)(3) specifically states in pertinent part that
If no such record was made in the court from which the appeal is taken, the appeal shall operate as an application for a plenary trial de novo without a jury in the court to which the appeal is taken. [Emphasis supplied]
The sanctions authorized for violation of N.J.S.A. 34:11-56a are found in N.J.S.A. 34:11-56a22 which states that a defendant "shall be guilty of a misdemeanor and shall upon conviction therefore be fined not less than $100.00 nor more than $500.00 or by imprisonment of not less than 10 nor more than 90 days...." Since the offense is deemed a misdemeanor, defendant contends, relying on In re Buehrer, 50 N.J. 501 (1967), that indictment and trial by jury are constitutionally mandated. However, a careful analysis of the rationale of Buehrer does not support that contention.
The court in Buehrer first noted that a misdeameanor is punishable pursuant to N.J.S.A. 2A:85-7 by a maximum fine of $1,000 or by imprisonment for not less than three years. Predicated on that penalty provision the court concluded that misdemeanors generally
... are within the constitutional guarantees of right to indictment and right to a trial by jury [whereas lesser offenses do not have] authorized maximum penalties as severe as those which may be imposed upon a conviction of a crime *392 [and] because the consequences of a conviction are limited, these offenses are beyond the concept of a `crime' within the intent of our State Constitution's provisions for indictment and trial by jury. [Id. at 517, 518]
The question then is whether the fact that the Legislature designated a violation of N.J.S.A. 34:11-56a4 as misdemeanor creates a right to trial by jury or whether the fact that the length of incarceration is limited to 90 days requires the offense to be treated as a disorderly persons' offense under which a constitutional right to trial by jury does not arise. Based on Duncan v. State of Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and its New Jersey progeny, State v. Owens, 102 N.J. Super. 187 (App.Div. 1968), review limited to right to trial by jury, 54 N.J. 153 (1969), this court concludes that exposure to incarceration for a maximum of 90 days does not invoke the constitutional right to trial by jury for violation of N.J.S.A. 34:11-56a4.
In Duncan, supra, defendant was charged and convicted of a simple battery, which is a misdemeanor punishable under Louisiana law by a maximum sentence of two years and a $300 fine. The Supreme Court focused solely on the length of possible incarceration under the specific Louisiana law when it concluded:
We need not, however, settle in this case the exact location of the line between petty offenses and serious crimes. It is sufficient for our purposes to hold that a crime punishable by two years in prison is based on past and contemporary standards in this country a serious crime and not a petty offense. [88 S.Ct. at 1454; emphasis supplied]
Our Supreme Court, in State v. Owens, supra, 54 N.J. at 163, made it clear that the possibility of consecutive terms of 90 days is irrelevant. The court in Owens then adopted and refined the holding in the Duncan decision as follows:

We think the severity of the authorized punishment is the only reliable test. If the maximum punishment does not exceed what may be imposed for a petty offense and the conviction does not carry the civil disabilities of a conviction for crime, we see no reason to say the Constitution demands a procedure reserved for crime. Nor do we think it is useful to sample popular opinion to determine how much stigma is attributed to each act of misconduct and thereupon to decide, in some way which escapes us, whether an offense is more than petty notwithstanding the statute has so treated it. It is for the legislature alone to *393 assay the public's judgment, and the legislature does so when it prescribes the legal consequences which may attend a conviction. [Owens, 54 N.J. at 160; emphasis supplied]
In the present case the Legislature has determined that the legal consequences for failure to pay overtime should be limited to a maximum of 90 days incarceration or a maximum fine of $500. This penalty obviously does not exceed the penalty that may be imposed for a petty offense.
Accordingly, the defendant cannot claim a constitutional right to a trial by jury for the violations of N.J.S.A. 34:11-56a4 here charged.

III. Defense of Good Faith
Defendant's defense of good faith is predicated on N.J.S.A. 34:11-56a25.2, which provides in pertinent part:
... [N]o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay ... overtime as required by N.J.S.A. 34:11-56a4 if he pleads and proves that the... omission complained of was in good faith in conformity with an in reliance on any written administrative regulation, order, ruling, approval or interpretation by the Commissioner of the Department of Labor & Industry or Director of the Wage and Hour Bureau, or any administrative practice or enforcement policy of such department or bureau with respect to the class of employers to which he belonged. Such a defense, if established, shall be a complete bar to the action or proceeding.... [Emphasis supplied]
Good faith is generally defined as honesty of intention and freedom from circumstances which ought to put the holder upon inquiry. Siano v. Helvering, 13 F. Supp. 776, 780 (D.C.N.J. 1936).
Defendant argues, in essence, that when N.J.A.C. 12:56-4.3[3] is viewed in the light created by the prism of statutes and *394 administrative regulations which together define "professional" standards for the practice of mortuary science, any licensed mortician would in good faith believe that he, as well as his trainee, function as bona fide professionals within the definition of a professional set forth in N.J.A.C. 12:56-4.3.
In 1960 the Legislature amended N.J.S.A. 45:7-33 by specifically deleting the word "profession" from the description of the practice of mortuary science and replacing it with the phrase "occupation charged with a high degree of public interest and subject to strict regulation and control." The State argues that the effect of this amendment is to preclude the officers and employees of Frech from claiming professional status pursuant to N.J.A.C. 12:56-4.3.
There is no documented legislative history as to the reasons for the shift from the designation of "profession" to "occupation." However, it may reasonably be inferred that this change was made in order to allow morticians to incorporate and receive the resulting tax advantages prior to the time that professionals were allowed to incorporate for that purpose. See N.J.S.A. 14A:17-1 et seq.
Incorporation by morticians was held permissible in Trinka Services v. Mortuary Science Board, 40 N.J. Super. 238 (Law Div. *395 1956). Chief Justice (then Judge) Hughes, focusing on the ancillary business and trade phases of the practice of mortuary science, found that those considerations substantially outweigh its professional aspects. The position of the Board of Mortuary Science was, however, that the classification of mortuary science as a profession is
... not merely one of nomenclature but of substance... since ... the realities of the relationship (of such practitioner to the public) embraces obligations such as those reflected in the lawyer-client or doctor-patient relationship ... and therefore the police power extends to their enclosure within the protective and restrictive containment of regulations appertaining to the professions. [Id. at 240]
The rejection of the Board's argument by the court in Trinka is not dispositive of the issue before this court of whether Frech, acting through its officers, believed in good faith that it was entitled to the professional exemption to N.J.S.A. 34:11-56a4.
The court finds, based on testimony adduced at trial, that N.J.S.A. 45:7-32 et seq. empowers the Board of Mortuary Science to adopt rules and regulations in regard to unprofessional conduct and mandates revocation or suspension of a mortician's license for unprofessional conduct. N.J.S.A. 45:7-38; N.J.S.A. 45:7-62.
Pursuant to N.J.A.C. 13:36-3.4(a)15, the licensing examination includes a section on professional ethics. The administrative rules and regulations promulgated by the Board also include a section requiring that "professional services" be listed separately on the final itemized bill. N.J.A.C. 13:36-1.9(c)(1). Professional services include preparation of the deceased, embalming, supervision and conduct of the funeral. These latter activities are engaged in on a continuous basis by licensed employees of Frech. Ken Barker testified that he was being trained to become proficient in these skills during the time he was a trainee at Frech. In fact, one of the most convincing items presented at trial to substantiate defendant's defense is a letter dated February 24, 1978 and sent by the Board of Mortuary License to Frank Magda, Ken Barker's preceptor, which states in part: "Enclosed is an Application for Trainee Registration for Kenneth *396 Barker. As Preceptor you shall be charged with the professional responsibility to train the applicant to be proficient in the following areas...." (Emphasis supplied).
Thus, the spirit of the Board's argument in Trinka, supra, remains embodied in the myriad of laws and administrative rules, regulations, practices and enforcement policies governing the practice of mortuary science.
The court further finds that it is not unreasonable for defendant to have assumed, as was testified, that a mortician's training is encompassed by N.J.A.C. 12:56-4.3(a)li, which is part of the definition of a professional under the Wage and Hour Law.[4] This section provides:
(a) The term "professional" means any employee
1. Whose primary duty consists of the performance of work.
i. Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and [distinguished] from training in the performance of routine mental, manual or physical processes.
It was pointed out at trial that a prospective licensee must have taken courses in anatomy, histology, embryology, pathology, chemistry, bacteriology, as well as other specified subjects in order to be prepared for a licensing exam. N.J.A.C. 12:56-4.3. Barker stated he did in fact take such courses. Testimony further revealed that there are schools of mortuary science which can be attended for purposes of reducing the required period of experience as a registered trainee. N.J.A.C. 13:36-3.2.
The court finds, based on testimony revealing the precise and complex nature of the practice of mortuary science, that the other subsections of N.J.A.C. 12:56-4.3, when read in pari materia with N.J.A.C. 13:36-1.1 et seq., support defendant's defense of good faith reliance on the Wage and Hour Laws.
The defense is further supported by the testimony of another funeral home owner, Mr. VanEmburgh, that he never has paid a *397 trainee overtime, for it is not feasible to do so in the context of the unpredictable scheduling of a mortician's job. This latter assertion was verified by Mr. Fleischman, owner of Frech, who added that Barker never once demanded overtime and was well paid for his services.
Finally, the court finds Fleischman's testimony to be credible and that he, as well as other licensed morticians testifying on his behalf, were sincere in their belief that they, as practitioners of mortuary science, are professional, accountable to the public as professionals and that people such as Ken Barker who are being trained to enter their demanding profession are to be considered as functioning in a professional capacity.
The point is that defendant need not be correct in its belief that its employees work in a bona fide professional capacity. Frech need only plead and prove that in good faith it reasonably believes that to be the fact.
Based on the above analysis of the broad statutory and regulatory scheme governing defendant, in conjunction with all evidence received at trial, the court holds that defendant Frech Funeral Home, Inc., acting through its officers and employees, has proved a "good faith" defense under N.J.S.A. 34:11-56a25.2.
Judgment of acquittal shall be entered for defendant.
NOTES
[1] N.J.S.A. 34:11-56a4, entitled "Minimum rate; overtime rate; exceptions," provides in pertinent part:

Every employer shall pay to each of his employees wages at a rate of not less than $3.35 per hour as of the effective date of this amendatory and supplementary act for 40 hours of working time in any week and 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week, except this overtime rate shall not include any individual employed in a bona fide executive, administrative, or professional capacity [as defined in N.J.A.C. 12:56-4.3]...." [Emphasis supplied]
[2] Heavner reflects the growing trend of applying the interest-analysis approach to conflict of laws problems. Specifically, our Supreme Court held:

We are convinced the time has come, for the reasons previously outlined, to discard the mechanical rule that the limitations law of this state must be employed in every suit on a foreign cause of action. We need go no further now than to say that when the cause of action arises in another state, the parties are all present in and amendable to the jurisdiction of that state, New Jersey has no substantial interest in the matter, the substantive law of the foreign state is to be applied, and its limitations period has expired at the time the suit is commenced here, New Jersey will hold the suit barred. In essence we will "borrow the limitations law of the foreign state." [63 N.J. at 140-141]
[3] N.J.A.C. 12:56-4.3 defines a professional in the context of the Wage and Hour Laws as follows:

(a) The term "professional" means any employee:
1. Whose primary duty consists of the performance of work:
i. Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship and from training in the performance of routine mental, manual or physical processes; or
ii. Which is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination or talent of the employee; and
2. Whose work requires the consistent exercise of discretion and judgment in its performance; and
3. Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical or physical work) and is of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and
4. Who devotes less than 20 per cent of his workweek to nonexempt work.
[4] Note 3, supra.