102 N.J. Super. 187 (1968)
245 A.2d 736
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RICHARD OWENS, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 27, 1968.
Decided July 1, 1968.
*190 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. Morton Stavis argued the cause for appellant (Messrs. Irvin L. Solondz and Morton Stavis, attorneys).
Mr. James R. Zazzali, Assistant County Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant was convicted in Newark Municipal Court on three charges of assault and battery under the Disorderly Persons Act (N.J.S. 2A:170-26). Two of these involved police officers acting in the performance *191 of their duties and one defendant's three-week-old child. He was also convicted for resisting arrest, a violation of the local ordinance. In sentencing defendant the magistrate imposed four consecutive nine-month terms of probation in lieu of confinement in the county jail. As to two of the charges, defendant was ordered to pay a fine of $1 a week for 18 months of the probation period.
Defendant appealed to the County Court, R.R. 3:10-2, where the matter was considered de novo on the record made before the municipal magistrate. R.R. 3:10-10(a). After hearing oral argument, the county judge found defendant guilty and imposed the same penalties as before.
Before proceeding to the facts, we observe that defendant challenges certain of the magistrate's factual findings. The claim is misdirected and may not be considered here, for this appeal is from the County Court judgment. R.R. 2:2-1(b).

I
While on patrol duty on January 13, 1967, Newark police officers Schmaltz and Yscamp received a radio call at about 5:17 P.M. to investigate a boyfriend-girlfriend dispute. They at once drove to the address given by the police dispatcher and were met at the side entrance by Eva Getter, who identified herself as defendant's wife. Only later did it appear that she and defendant were not married, but were living together with their newborn child. One of the officers testified that upon arrival he observed that Miss Getter "was worried and she was in hysterics." She said she had been locked out of her apartment after a fight with defendant and exclaimed, "All I want is the baby, my baby and my clothes so I can move out."
Miss Getter directed the officers to the door of the apartment, located a few feet from the side entrance to the building. Defendant answered the doorbell but refused admission to the officers and Miss Getter. Yscamp testified that defendant began screaming and yelling at them, although they had explained they would like to talk to him about his *192 problem and help out. Defendant shouted, "You don't have a search warrant and you can't come in here," and with this he slammed the door in their faces. The officers turned to Miss Getter in an attempt to find out what was the matter with the man  had he been drinking or was he crazy? Her answer was unresponsive; all she kept repeating was her hysterical demand for her baby.
Unable to learn anything more. Yscamp again rang the doorbell. On cross-examination Yscamp described his thoughts at that moment:
"We were concerned about the baby. This was the main concern. It was her concern and it was our concern, the baby."
Pressed further, he testified that on the basis of the facts before them, they feared for the child's safety:
"We had concern for the baby. She [Miss Getter] was near hysterical. She wanted the baby. With the condition of this guy answering the door, yelling and screaming, we were concerned for the baby. This was the main reason why [we rang the bell again], if the baby was in there, the baby's life might be in danger.

* * * * * * * *
Q. Any idea about the baby's life being in danger was your idea? A. No. She made us believe that by the way she was acting, by her concern. She wanted the baby.
Q. She wanted the baby. A. She wanted the baby. This was her concern. It was our concern to find out how the baby was." (Emphasis supplied)
After the second ring defendant again opened the door, this time only a few inches. The officers told him (and repeated several times) that they only wanted to talk to him: "We'd like to talk to you. We don't have to come in. We'll talk to you right here." They received the same answer as before. This time, however, as defendant tried to slam the door its movement was abruptly halted by Yscamp's foot just inside the doorframe. Defendant three times slammed the door against the officer's shoe in unsuccessful attempts to close it. Upon his third failure defendant, a powerful *193 6'2" man weighing more than 190 pounds, suddenly threw the door wide open, struck out at the officers, and with his fist hit Schmaltz in the head. Miss Getter became even more hysterical than when defendant had slammed the door the first time.
Both officers immediately grabbed at defendant and pushed him into the apartment. As the officers seized him, he punched and kicked as he fought them off. The struggle inside the apartment continued for five minutes, defendant violently resisting every attempt to subdue and handcuff him. Miss Getter stood by, screaming. The three men grappled on the floor, with the officers trying to get defendant's hands behind his back in order to manacle him securely. They at last managed to get the handcuffs on, but only with defendant's arms in front of him. In the course of the melee Schmaltz struck defendant with his service flashlight.
Defendant was finally subdued and held on the floor in prone position, with Yscamp sitting on his back. Schmaltz then went outside to radio for assistance. At this point defendant somehow managed to get up and, despite efforts to restrain him, ran into the bedroom where the child was lying on the bed. Miss Getter resumed her screaming, and after defendant had picked up the child and returned to the living room Yscamp yelled at him to release it. Another struggle ensued, defendant (despite the handcuffs) squeezing the baby around its middle and holding it over his head, with Yscamp grasping defendant by the neck and Miss Getter trying to wrest the child from defendant's hands. The testimony was that at one point defendant yelled, "If they don't let me go, I'm going to kill him, kill my baby. * * * They're not going to take my baby away."
Hearing the screams, Schmaltz returned to the apartment. The officers managed to get the child from defendant, and as they turned it over to Miss Getter, she cried out, "You killed my baby, you killed my baby," before exiting to a neighbor's apartment. And when she handed the child to her neighbor she said, "Oh, he's dead. I know he's dead *194 because he's all blue in the face." The neighbor testified that she observed bloodstains on the child's neck and marks on its body.
Eventually, other police arrived and defendant was removed to the police station. Miss Getter and the baby were taken to a local hospital to have the child examined. The hospital report shows that she told the nurse that the father had tried to choke the baby.
The condition of the apartment following the affair was silent witness to the violence of the struggle that had taken place there. The living room and bedroom were in total disarray, furniture broken, pieces of glass from a shattered ashtray were littered about, and bloodstains were visible in several places on the floor.
At the police station defendant was very uncooperative in giving his name and other required information. One officer noticed blood on defendant's pants leg and rendered first aid to a laceration below the kneecap. Defendant appeared to be ill and was taken to a hospital where he was treated for the laceration and concussion. He remained hospitalized for two weeks.
We note that before trial in the municipal court defendant had brought a civil action against the two police officers (and others), seeking damages for the injuries he allegedly suffered at their hands. A substantial part of the voluminous record before us appears to have been made with the civil suit in mind, even though the outcome of this appeal can have no direct bearing on that matter.
Defendant's version of the incident differs markedly from that related by the prosecution witnesses. He testified that the officers were disrespectful even before he first opened the door, and after he had answered their ring they cursed him for not opening the door. He also alleged that the officers pushed the door open after his unsuccessful attempts to close it, and that as soon as they had done so they lunged at him, spouting curses. One of them began beating him about the head with a flashlight, while the other choked *195 him by putting an arm around his throat. Defendant categorically denied ever striking or even swinging at the officers. (Here mention should be made of the fact that Schmaltz, the officer who claimed to have been struck, was treated for mild concussion by the police surgeon.)
Defendant testified that the officer holding him let him get up from the floor just before he went into the bedroom where the baby was. After he had picked up the child, the officer began beating him again. Miss Getter, whose presence defendant claimed not to have previously noticed, began screaming, "My God, my baby is turning blue." However, when she asked for the child he handed it over to her. Defendant also testified to further brutality by the officers: kicking him after he had been subdued, burning his eyelash with a cigarette while they were still in the apartment, and further disrespect, threats and lack of concern for his injuries while at the police station.
It is appropriate at this point to note that the magistrate had sequestered the witnesses on defendant's motion. When Miss Getter was called by the State the magistrate declared her a hostile witness because of her reluctant answers. She failed to describe two separate instances of the door being opened  a fact agreed upon by the officers and defendant. According to her, the officer inserted his foot in the doorway when defendant came to the door the one time. There were serious discrepancies between her testimony and defendant's, and between her testimony and the statement she had given the police just three hours after the incident. Her memory, she claimed, was better on the day of trial than the evening of the occurrence. Incidentally, she also testified that she and defendant planned to marry.
The County Court judge not only had the benefit of the record made in the municipal court, but also extensive argument by counsel. In reaching his decision the judge disregarded most of Miss Getter's testimony and characterized defendant as a "liar," finding his story "incredible." On the other hand, he found the testimony of the officers credible and *196 unmarred by discrepancy. He also believed other witnesses produced by the State  the police sergeant who had responded to the officers' call for assistance, and Shirley Jones, the neighbor to whom Miss Getter brought the child and who gave significant testimony as to what had happened in defendant's apartment.
With regard to what the two officers had done, the judge said:
"* * * I conclude under the facts here that probable cause existed to enter the defendant's home taking into consideration the totality of all the circumstances. A woman says she is the wife and she is hysterical and her baby is inside. The police had to deal with the situation as it arose and I hold that under those circumstances they acted reasonably and they had probable cause to go into the defendant's apartment.
All this defendant had to do was say that this is something between my wife and myself. He didn't have to slam the door the way he did. I think under the circumstances the police acted reasonably and did what they thought was proper under the circumstances. When they entered the apartment they had probable cause to do so."
He concluded that the facts supported the assault and battery charges as well as that of resisting arrest, and accordingly found defendant guilty. Other questions, again raised on this appeal, were decided against defendant.

II
A substantial portion of defendant's brief is devoted to challenging the factual findings of the County Court judge and the conclusions he had drawn from them. As we have noted, his resolution of the factual issues rested principally upon his appraisal of credibility of the witnesses.
It is now well established that our role in reviewing the factual findings of a trial court is greatly circumscribed. Where the findings could reasonably have been reached on sufficient credible evidence present in the whole of the record, we will not disturb the conviction. State v. Johnson, 42 N.J. *197 146, 162 (1964). Only where we are "thoroughly satisfied that the finding of guilt is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction," do we appraise the record as if we were deciding the matter at inception and make our own findings and conclusions. Ibid.
Our reading of the record convinces us that defendant's conviction is supported by substantial credible evidence. We recognize that the pendency of a civil suit growing out of the incident here under review may have tended to influence the testimony. But such influence must have operated on the arresting officers as well as defendant and Miss Getter. In effect, it cancelled out. The State's witnesses were believed by the county judge on his de novo review, as they had been by the magistrate. Their testimony was sufficient to prove the elements of assault and battery committed on the officers and the infant, as well as the charge of resisting arrest.

III
Defendant's principal contention on appeal is that the police unlawfully entered his home, and he was therefore fully justified in forcibly resisting their unwarranted intrusion. In making this argument defendant is willing to "assume the facts as stated by the police."
The crucial fact in this case was Officer Yscamp's placing his foot in the door to the apartment as defendant was about to slam it shut, refusing for a second time to talk to the police or Miss Getter. The issue thus raised is whether the foot in the door  what defendant terms an intrusion into his home and castle  was justifiable because based on probable cause. The focus of our inquiry must therefore be on that brief period of time between the officers' arrival at the building where they met Miss Getter and the instant when Yscamp's foot kept the door from closing.
*198 The United States Supreme Court has said that probable cause exists where
"* * * `the facts and circumstances within [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555, 39 A.L.R. 790." (Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949))
This statement is reflected in the opinions of our Supreme Court. See State v. Contursi, 44 N.J. 422, 430 (1965); State v. Burnett, 42 N.J. 377, 387 (1964). Chief Justice Weintraub in Burnett, after quoting from Brinegar, said (at page 387): "Probable cause then is something sufficient to engender a belief somewhere between a bare suspicion and a conviction of guilt." What follows is significant in the context of our case:
"* * * Further, the issue is not whether the information which reached the officer was true or false but only whether the officer was reasonable in accepting the information as true. And in reaching his `belief' the officer is not limited to evidence admissible in the courtroom. For example, hearsay will do if coupled with something to give it credit, * * *." (Ibid.)
The factual setting here merits quick review. Two uniformed officers, Schmaltz and Yscamp, were brought to defendant's door by an hysterical woman demanding her baby and clothes and who claimed to be the wife of the man inside. The moment the door opened defendant began yelling and, in spite of offers of assistance by the officers and no attempt on their part to enter his home, slammed the door in the face of all three persons outside. This so affected Miss Getter that she was unable to furnish the officers with any information whatsoever about her alleged husband. As one officer testified, because of her highly agitated condition they became concerned for the safety of the baby, said to be inside. *199 Defendant's manner and behavior only served to increase their concern. When their second attempt to talk to defendant faced imminent failure  and this despite their assurances that they only wanted to talk to him and be of help, and could do so without entering  Yscamp prevented defendant from closing the door.
Police officers faced with emergent matters in the performance of their duties are not required to be constitutional lawyers. The Fourth Amendment requires only that their actions be reasonable under the circumstances, and in assessing the quality of their behavior courts recognize the factual and practical considerations which guide reasonable and prudent laymen in the conduct of their everyday lives. Particular attention must be paid to the "common and specialized experience and work-a-day knowledge of policemen." State v. Contursi, above, 44 N.J., at page 431. Judicial review of police action taken in the face of a fastmoving, excited situation must be "in a commonsense and realistic fashion." United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965).
Measuring the conduct of the officers by this standard, we find that they acted reasonably in believing that Miss Getter was defendant's wife, that there was a baby inside and that its life might be in danger. Miss Getter's distraught, irrational condition and defendant's violent behavior were enough to permit of the reasonable inference and belief by the police that a crime was being or was about to be committed against the child. Considering the totality of the attendant circumstances, there was probable cause to justify Yscamp's action  and the county judge properly so found.
Thus, officers Yscamp and Schmaltz were involved in the lawful exercise of their duties at the moment the door first struck Yscamp's shoe. Their attempts to pursue proper police practice, initially met by defendant's resistance of every effort to speak with him, brought on defendant's blow to the side of Schmaltz's head. At that moment defendant was chargeable with the high misdemeanor described in *200 N.J.S. 2A:90-4, assault and battery upon a uniformed police officer acting in the performance of his duties. He was subject to arrest without a warrant because the act or acts constituting the offense were committed in the presence of an officer of the law. State v. Doyle, 42 N.J. 334, 345-346 (1964); State v. Smith, 37 N.J. 481, 494-495 (1962), certiorari denied 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963); State v. Ferraro, 81 N.J. Super. 213, 218 (Cty. Ct. 1963); cf. Annotation, 76 A.L.R.2d 1432, 1436 (§ 2), 1444 (§ 3) (1961).
The moment the two officers crossed the threshold of defendant's apartment and attempted to subdue, restrain and handcuff him, they were arresting him for his attack on Schmaltz. State v. Doyle, above; and see State v. Bell, 89 N.J. Super. 437, 443 (App. Div. 1965). As noted, defendant's resistance was violent and lasted a full five minutes, so that the county judge was quite correct when he found that "under all the facts here the defendant resisted arrest from the very beginning and again after he was handcuffed."
In the light of what has been said, each of defendant's claims that there was no probable cause to enter without permission, that he was not under arrest during the course of the struggle, and that he had a right to defend his home from unjustifiable invasion, must fall. "It has always been illegal to resist a lawful arrest." Warner, "The Uniform Arrest Act," 28 Va. L. Rev. 315, 330 (1942), quoted with approval in State v. Koonce, 89 N.J. Super. 169, 181 (App. Div. 1965). Defendant, by striking Officer Schmaltz, had forfeited his right to retreat behind the closed door of his "castle" and bar peace officers from entering. Defendant would not even have been justified in physically resisting an illegal arrest. As this court had occasion to say in Koonce, above, "a private citizen may not use force to resist arrest by one he knows or has good reason to believe is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances obtaining." (at page 184).
*201 Accordingly, under the facts of this case defendant could properly be found guilty of assault and battery upon each of the police officers and the baby, and of resisting arrest.

IV
Officer Yscamp and Schmaltz initially signed separate complaints charging defendant, under N.J.S. 2A:90-4, with assault and battery upon each of them respectively  a high misdemeanor. Yscamp signed a further complaint charging defendant with assault and battery upon the baby, in violation of N.J.S. 2A:170-26, and Schmaltz one charging him with resisting an officer, in violation of the Newark ordinance. At the trial in the municipal court the prosecution moved to downgrade the charges under N.J.S. 2A:90-4 to disorderly persons offenses under N.J.S. 2A:170-26. The motion was granted over the timely objection of defendant's attorney that the downgrading would deprive him of his constitutional right to indictment by grand jury and trial by petit jury since the two charges involved were indictable offenses.
The granting of the motion below brought all four charges within the ambit of the municipal court's jurisdiction. That court has jurisdiction in cases involving violations of the Disorderly Persons Law, N.J.S. 2A:8-21(d), and, of course, violations of any municipal ordinance (here, that section of the Newark ordinance dealing with resisting a police officer), N.J.S. 2A:8-21(c). Defendant again contends that the downgrading of the N.J.S. 2A:90-4 offenses was improper, and advances essentially the same argument here as he did in the municipal court.
"It is unusual to find a defendant contending that he should not be tried on a disorderly persons charge, but rather for a high misdemeanor, conviction of which would give him a criminal record. * * *" State v. States, 44 N.J. 285, 293 (1965).
Nonetheless, defendant, for whatever reason, does make such a contention.
*202 In the case of In re Buehrer, 50 N.J. 501 (1967), our Supreme Court observed that a person charged and tried on a lesser offense (there, contempt) could not raise, "without great strain," the claim that he was denied equal protection of the law because tried for a petty offense rather than the greater offense which might have been charged on the same facts (at page 521). The court said:
"It is of course commonplace that a prosecutor need not pursue the maximum charge a factual complex could sustain. Discretion must repose somewhere to avoid the injustice of blind rigidity. * * *" (Ibid.)
The downgrading of offenses is not uncommon in our daily criminal practice. The decision to seek a conviction on a lesser charge is often a practical or even tactical one, involving factors and considerations best known to the prosecutor. Even so, the decision is not left solely to his own judgment. In any case where the offense charged is sought to be downgraded, a proper motion must be addressed to the court and granted. And if the judge, on his own motion, would downgrade the offense charged in the complaint, he must first seek and obtain permission of the prosecutor. State v. Dixon, 40 N.J. 180, 187 (1963). Since two of the four complaints against defendant charged high misdemeanors and, therefore, indictable offenses, the municipal magistrate would have had no jurisdiction over them unless the motion to downgrade had been made and granted. State v. Le Jambre, 42 N.J. 315, 318 (1964).
The prosecutor did make a proper motion in this case, and the municipal magistrate granted it. In the course of his objection to the granting of the motion, defendant's attorney properly recognized that downgrading was a matter lying within the discretion of the magistrate, taking into consideration all the circumstances. Thus, unless an abuse of this discretion can be shown, we will not disturb the magistrate's determination.
*203 It is difficult to understand what it is that defendant assigns as an abuse of discretion. The facts we have set out above might well have supported a conviction for a high misdemeanor. Instead, defendant was charged with and convicted of only disorderly persons offenses. This does not give him a criminal record. See State v. States, above, at page 293. If the prosecutor's decision to downgrade is to be characterized at all, it might well be considered as a lenient treatment of an aggravated situation.
There is no lack of clear authority for what was done in this case. The interplay of the same two statutes as here involved, N.J.S. 2A:90-4 and N.J.S. 2A:170-26, was discussed in State v. States, above, in terms of the prosecution's decision to proceed only under the Disorderly Persons Act. The court said that
"The mere fact that two statutes overlap in prohibiting the same act does not mean that the later law [N.J.S. 2A:90-4] automatically repeals the earlier one pro tanto, or that an alleged offender can only be prosecuted for the more serious offense." (at page 291)
The court then pointed out that there are many situations where criminal statutes overlap in prohibiting the same basic act, and that it is not unusual to permit the prosecutor, in the exercise of discretion and considering the attendant circumstances, to determine under which statute he would proceed. (at page 292).
Accordingly, we find no error in the municipal magistrate's granting of the motion to downgrade to disorderly persons offenses the two charges brought under N.J.S. 2A:90-4.

V
The question remains whether defendant was entitled to a jury trial on the three charges of assault and battery, prosecuted under N.J.S. 2A:170-26. This requires a consideration of Duncan v. State of Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (May 20, 1968), decided *204 one week before the argument in our case, but not cited by either counsel then or since.
Duncan was convicted of simple battery, a misdemeanor punishable under Louisiana law by a maximum sentence of two years' imprisonment and a $300 fine. The Louisiana Constitution grants a jury trial as of right only in capital cases or in noncapital cases where the sentence imposed may be imprisonment at hard labor. La. Const., Art. VII, § 41. Defendant nonetheless requested a jury trial. It was denied. Duncan sought review in the Supreme Court of Louisiana, claiming that the denial of a jury trial violated the rights guaranteed him by the United States Constitution. That court, finding no error of law, declined to review the ruling. The United States Supreme Court reversed, holding that "a crime punishable by two years in prison is, based on past and contemporary standards in this country, a serious crime and not a petty offense." The court said that the right to a jury trial, as guaranteed by the Fourteenth Amendment, exists in all criminal cases which, were they to be tried in a federal court, would come within the Sixth Amendment's guarantee.
Louisiana contended that even if it had to grant jury trials in serious criminal cases, Duncan's conviction was valid because he was tried for simple assault and battery and sentenced to only 60 days in the parish prison. The court was not persuaded, stating:
"* * * It is doubtless true that there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision and should not be subject to the Fourteenth Amendment jury trial requirement here applied to the States. Crimes carrying possible penalties of six months do not require a jury trial if they otherwise qualify as petty offenses, Cheff v. Schnackenberg, 384 U.S. 373 [86 S.Ct. 1523, 16 L.Ed.2d 629] (1966). But the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the Sixth Amendment. District of Columbia v. Clawans, 300 U.S. 617 [57 S.Ct. 660, 81 L.Ed. 843] (1937). The penalty authorized by the law of the locality may be taken `as a gage of its social and *205 ethical judgments,' 300 U.S., at 628 [57 S.Ct. 660], of the crime in question." 391 U.S., at p. 159, 88 S.Ct., at p. 1453, 20 L.Ed.2d, at p. 502.
Observing that so-called petty offenses were tried without juries both in England and the Colonies and had always been held exempt from the otherwise comprehensive language of the Sixth Amendment's jury trial provisions, the court stated:
"* * * There is no substantial evidence that the Framers intended to depart from this established common-law practice, and the possible consequences to defendants from convictions for petty offenses have been thought insufficient to outweigh the benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inexpensive nonjury adjudications. These same considerations compel the same result under the Fourteenth Amendment."
Continuing, the court said:
"Of course the boundaries of the petty offense category have always been ill defined, if not ambulatory. In the absence of an explicit constitutional provision, the definitional task necessarily falls on the courts, which must either pass upon the validity of legislative attempts to identify those petty offenses which are exempt from jury trial or, where the legislature has not addressed itself to the problem, themselves face the question in the first instance. In either case it is necessary to draw a line in the spectrum of crime, separating petty from serious infractions. This process, although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little." 391 U.S., at p. 160, 88 S.Ct., at p. 1453, 20 L.Ed.2d, at p. 502.
The court noted that petty offenses are defined in the federal system as those punishable by no more than six months in prison and a $500 fine. 18 U.S.C.A., § 1. In 49 of the 50 states crimes subject to trial without a jury are punishable by no more than one year in jail.[1]
*206 After further observing that in the late Eighteenth Century crimes in this country triable without a jury were for the most part punishable by not more than six months in prison (although there were exceptions to this rule), the court concluded:
"* * * We need not, however, settle in this case the exact location of the line between petty offenses and serious crimes. It is sufficient for our purposes to hold that a crime punishable by two years in prison is, based on past and contemporary standards in this country, a serious crime and not a petty offense."
Duncan's conviction was reversed and the case remanded.
Dyke v. Taylor Implement Mfg. Co., Inc., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538, decided the same day as Duncan, emphasized that "This Court has not had occasion to state precisely where the line falls between punishments that can be considered `petty' and those that cannot be. * * * [I]t is clear that a six-month sentence is short enough to be `petty.'" The criminal contempt with which Dyke and others had been charged was held a petty offense because the maximum penalty permitted under the Tennessee statute was ten days in jail and a $50 fine.
Compare Bloom v. State of Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522, decided along with Duncan and Dyke, where Bloom had been found guilty of criminal contempt for filling a spurious will for probate and sentenced to 24 months in prison. The court held that it was constitutional error to deny Bloom his right to trial by jury.
From Dyke we learn that where an offense is punishable by no more than a six-month sentence, the offense is deemed "petty," not entitling a defendant to a jury trial. On the other hand, Duncan instructs us that an offense *207 punishable by a maximum prison sentence of two years may not be characterized as "petty," and that a defendant charged with such an offense may not be denied his constitutional right of trial by jury. The United States Supreme Court has failed to mark the line separating a petty from a nonpetty offense in terms of the maximum sentence that can be imposed.
At the time defendant was convicted N.J.S. 2A:169-4 stated that, except as otherwise expressly provided, one adjudged to be a disorderly person should be punished by imprisonment in the county workhouse, penitentiary or jail for not more than one year, or by a fine not exceeding $1,000, or both.[2] This general provision would apply in the case of an assault and battery under N.J.S. 2A:170-26 of the Disorderly Persons Act. The possible one-year penalty fell in between those considered in Dyke and Duncan. We are not persuaded that a disorderly persons offense of the kind here considered should be deemed other than petty because of *208 the one-year sentence that could be imposed, especially in light of State v. Maier, 13 N.J. 236 (1953), where the history of the jurisdiction to try and punish simple assaults and batteries without indictment and without trial by jury was traced at some length and N.J.S. 2A:170-26 found constitutional by a divided court.
Accordingly, the convictions are affirmed.
NOTES
[1] The court made special mention in footnote 33 that N.J.S. 2A:169-4, our general penalty statute for disorderly persons offenses, was one of the only two instances in the nation, aside from the Louisiana statute under review, denying a defendant a jury trial where the maximum permissible sentence might exceed six months in prison; and that such denial of a jury trial had been upheld against state constitutional attack by a 4-3 vote in State v. Maier, 13 N.J. 235 (1953).
[2] In light of the United States Supreme Court decisions in Duncan and Dyke, the Legislature has just passed Assembly Bill No. 847, amending N.J.S. 2A:169-4 to read that a person adjudged a disorderly person "shall be deemed to have been guilty of a petty offense" and be punished by imprisonment in the county workhouse, penitentiary or jail for not more than six months, or by a fine of not more than $500, or both. The bill was signed into law by the Governor on June 25, 1968, and is now L. 1968, c. 113. Referring to the Duncan-Dyke holdings, the Statement attached to the bill recites:

"The [United States Supreme Court] has thus left a vast hiatus for cases where imprisonment is authorized for more than 6 months and for not more than 1 year. Nearly all of New Jersey's Disorderly Persons Act violations are subject to a 1 year maximum, even though the vast majority do not result in sentences longer than 6 months.
A hopeless problem would arise if the New Jersey limit were to be found subject to jury trial requirements. There are difficult enough obstacles now to the empaneling of sufficient juries for the trial of crimes; if juries were required for the petty offense of violation of the disorderly persons law, Parkinson's law would flower in full bloom with huge masses of the population spending their time sitting on juries."