139 N.J. Super. 264 (1976)
353 A.2d 535
ESSEX COUNTY BOARD OF TAXATION, PLAINTIFF-RESPONDENT,
v.
CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; KENNETH A. GIBSON, MAYOR OF NEWARK; EARL HARRIS, MICHAEL BOTTONE, ANTHONY GIULIANO, MARIE VILLANI, JAMES ALLEN, ANTHONY CARRINO, SHARPE JAMES, HENRY MARTINEZ, DONALD TUCKER, INDIVIDUALLY AND AS MEMBERS OF THE MUNICIPAL COUNCIL OF NEWARK; JOHN GREXA, FINANCE DIRECTOR OF NEWARK; FRANK D'ASCENSIO, CITY CLERK OF NEWARK; AND JOSEPH FRISINA, TAX ASSESSOR OF NEWARK, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 1976.
Decided February 4, 1976.
*267 Before Judges KOLOVSKY, BISCHOFF and BOTTER.
Mr. Melvin Simon argued the cause for appellants (Mr. Milton A. Buck, Corporation Counsel, attorney).
Mr. Harry Haushalter, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney, Mr. Richard M. Conley, Deputy Attorney General, of counsel).
The opinion of the court was delivered by KOLOVSKY, P.J.A.D.
Plaintiff Essex County Board of Taxation (county board) has tried since March 1972, albeit unsuccessfully, to compel the City of Newark to undertake a revaluation of all its real property  this to secure, as mandated by N.J.S.A. 54:3-13, the taxation of all property in the city at its taxable value. Cf. Bergen Cty. Bd. of Tax. v. Bogota, 114 N.J. Super. 140 (App. Div. 1971).
Defendants' appeal is from an order (whose contents will be described later) entered by the trial judge on March 10, 1975 in an effort to effectuate the revaluation program after defendants had failed to comply with prior orders in the nature of mandamus entered by the trial judge on May 8, 1974 and October 25, 1974.
*268 The revaluation had originally been ordered by the county board, with the approval of the State Director of Taxation, by an order dated March 1, 1972. The order was not complied with. On March 12, 1974 the county board instituted this action in lieu of the prerogative writ of mandamus against the city and its tax assessor. The complaint was subsequently amended to add as parties defendant the city's mayor, clerk and finance director, as well as the nine members of the municipal council.
After hearing argument on the return of an order to show cause, the trial judge entered an order dated May 8, 1974 ordering defendants: (1) to comply "immediately" with the board's order of March 1, 1972; (2) to submit monthly reports to the county board and the Attorney General as to the progress of the revaluation program; and (3) to effectuate "the completed revaluation by October 1, 1975, to be effective for the tax year 1976." The court retained jurisdiction for the purpose of obtaining compliance with the order.
No appeal was taken from that order. Indeed, none would have been warranted. "The kind of comprehensive revaluation [so ordered] has become a commonplace of municipal fiscal practice" and one which defendants were duty bound to provide, Bergen Cty. Bd. of Tax. v. Bogota, supra, 114 N.J. Super. at 145, if necessary, by making a special emergency appropriation under the power expressly granted by N.J.S.A. 40A:4-53(b).
It appeared initially that the court's order would be complied with. By letter of May 3, 1974  even before the formal order of May 8 was entered  the tax assessor wrote the Attorney General that in compliance with the court's order the city was "moving to secure a revaluation firm to undertake" a city-wide revaluation program to be completed by October 1, 1975; that an advertisement soliciting bids was being published on May 4, 1974, with the bids to be received on May 14, 1974.
Only one bid, that to perform the revaluation work for $1,480,000, was received on May 14, 1974. At the June 5, *269 1974 meeting of the municipal council an ordinance authorizing a special emergency appropriation of $1,480,000 for the revaluation program was moved to first reading for the June 19 meeting. Action thereon was then postponed to the July 17 meeting. By letter of July 26, 1974 the assessor advised the Attorney General that the ordinance had been passed on first reading by a 5 to 4 vote and would come up for second reading and final passage at the council's meeting of August 7, 1974, the letter noting that a 6-vote majority was required for final adoption of the ordinance. Action on companion resolutions authorizing the contract and authorizing issuance of notes was deferred.
After having failed of passage at the August 7 council meeting the ordinance was taken up again at the meeting of September 4, 1974. Then too it failed of adoption. On a roll call only the following members, Bottone, Giuliano, Villani and Harris, voted for adoption, and Councilmen Allen, Carrino, James, Martinez and Tucker voted "nay." A motion to table the ordinance and the two resolutions was then adopted by a vote of 7 to 2.
On the county board's application for supplemental relief and on notice to defendants the trial judge entered the order of October 25, 1974 providing that (1) defendants comply immediately with the court's order of May 8, 1974; (2) by November 4, 1974 (a) the municipal council and its nine named members provide, by the enactment of an appropriate ordinance, sufficient appropriations pursuant to the pending bid to fund the revaluation program of the City of Newark ordered by the court, (b) the city and its officials enter into a contract with the revaluation company which had submitted the bid, and (c) defendants provide the Attorney General with a report as to the status and progress of the revaluation program; and (3) that in the event the court's order has not been complied with by November 4, 1974, the Attorney General's office be "authorized to seek [on five days' notice] whatever relief or sanctions, including but not limited to, contempt *270 proceedings or for such other and further relief as may to the court seem just and proper."
Although the matter was again taken up at the council's meetings of November 6 and November 20, 1974, the majority of the members of the council failed to comply with the court's order. At the November 6 meeting only Councilmen Allen, Bottone and Harris voted in favor of the appropriation ordinance (Mrs. Villani was absent). At the November 20, 1974 meeting the ordinance fared even worse; only Councilmen Bottone and Harris voted in favor of it, the other seven members of the council voted "nay."
Two courses  whose legal bases are unassailable  were available to plaintiff to overcome the flagrant disregard of the court's orders by the members of the council who voted against the ordinance.
A willful disobedience of a court's order constitutes a criminal contempt for which the offender may be prosecuted in proceedings instituted by the court on its own motion or upon the basis of information supplied by a litigant. In re Fair Lawn Education Ass'n., 63 N.J. 112, 115-116 (1973), cert. den. 414 U.S. 855, 94 S.Ct. 155, 38 L.Ed.2d 104 (1973); In re Buehrer, 50 N.J. 501 (1967); N.J. Dept. of Health v. Roselle, 34 N.J. 331, 342 (1961).
On the present record it appears that institution of such a prosecution would have been fully justified. Apposite is what the United States Supreme Court said in United States v. United Mine Workers of America, 330 U.S. 258, 302-303, 67 S.Ct. 677, 700-701, 91 L.Ed. 884 (1947):
Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court. * * * The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril.
and what our own Supreme Court said in In re Tiene, 17 N.J. 170 (1954):
*271 The orderly processes of the administration of justice are necessarily dependent on full compliance with all lawful orders of the courts. To prevent recalcitrant individuals from frustrating their work, the courts are necessarily empowered to punish for contempt. Here the defendants, acting contrary to the advice of their counsel, deliberately flouted the lawful subpoenas and orders of the courts. The courts accordingly have no choice, if they are to do their duty in administering justice, but to punish the defendants for their misconduct. [at 181]
It is of no moment that the recalcitrant defendants are public officials.[1] On the contrary, prosecution for criminal contempt is universally recognized as particularly appropriate in the case of those, including public officials, who have willfully violated court orders or judgments in the nature of mandamus requiring the performance of duties imposed by law. Roselle v. Moonachie, 48 N.J. Super. 17, 23-26 (App. Div. 1957), opinion on reargument 49 N.J. Super. 35 (App. Div. 1958); Boon Bros. v. Noonburg, 9 N.J. Misc. 138, 153 A. 98 (Sup. Ct. 1931); 17 McQuillin, Municipal Corporations (3 ed.) § 51.72 (1968).
Further, plaintiff could have instituted proceedings in aid of litigant's rights to have the recalcitrant defendants committed until they complied with the court's orders  this under the authority of R. 1:10-5:
Notwithstanding that an act or omission may also constitute a contempt of court, a litigant in any action may seek relief by application in the action. * * * If an order entered on such an application provides for commitment, it shall specify the terms of release. * * *
Instead of invoking the legally settled and effective remedies thus available to it, plaintiff sought to accomplish its objective *272 by applying for and obtaining two orders, the latter of which defendants challenge on this appeal.
On January 20, 1975 an order was entered in this cause authorizing plaintiff to contract with a reputable revaluation company for the purpose of implementing the revaluation program in the City of Newark and with a reputable land surveying company to secure, if necessary, an up-to-date tax map for the city. The order further provided that the cost of the revaluation and tax map programs was to be the responsibility of the city with the county board not to be responsible for any part thereof. Finally, the order extended the completion date of the revaluation program for one year and provided that
* * * the plaintiff obtain the necessary funds to pay for the revaluation program and tax map program, should that latter program be required, from the City of Newark in whatever appropriate legal fashion the plaintiff determines to choose.
No appeal was taken from the January 20, 1975 order. This appeal is from the order subsequently entered on March 10, 1975 to provide funds to meet the cost of the contracts which the county board had been authorized to enter into on behalf of the city. The March 10 order (1) authorized the county board to receive, from the State Treasurer, Newark's share of replacement revenues to be distributed to the city pursuant to N.J.S.A. 54:11D-1 et seq. and to use those revenues for funding the contracts, and (2) directed the State Treasurer to withhold payment to Newark of such amounts of Newark's share of replacement revenues as the county board should periodically certify to the State Treasurer are required to pay for funding the contracts and instead distribute those amounts to the county board.
The cited statute is part of a related group of acts passed by the Legislature in 1966 which
* * * deprived municipalities of the power to tax tangible personal property used in business while at the same time imposing new and increased state taxes on business and business assets. It *273 further provided for the distribution of revenues received from this source among municipalities "in replacement of the revenues [formerly] derived by such municipalities from the local taxation of personal property used in business." [In re Clifton v. Passaic Cty. Bd. of Tax., 114 N.J. Super. 253, 257 (App. Div. 1971), aff'g 108 N.J. Super. 284 (Law Div. 1970), aff'd o.b. 60 N.J. 185 (1972)]
The statute directs that the Director of the Division of Taxation determine annually and certify to the State Treasurer (1) the amount of replacement revenues which will be available for distribution to the municipalities, and (2) the amounts to be allocated to each municipality under the formula set forth in the statute. N.J.S.A. 54:11D-2, 3 and 4. The annual amount allocated to each municipality is to be distributed to it by the State Treasurer in four equal installments on March 1, May 1, August 1 and November 1 of each year. N.J.S.A. 54:11D-5 and 6.
The moneys thus to be received by the municipality are anticipated miscellaneous revenues. Under the legislative mandate embodied in the Local Budget Law (N.J.S.A. 40A:4-1 et seq.) such revenues may be disbursed for a particular purpose only if the governing body has theretofore made an appropriation for such purpose. The appropriation may be effected either by including it in the annual budget to be adopted by the municipality, N.J.S.A. 40A:4-3, or in authorized situations, by adopting a resolution making an "emergency" appropriation or an ordinance making a "special emergency" appropriation. Provisions authorizing emergency appropriations by resolution are set forth in N.J.S.A. 40A:4-46 et seq. Power to adopt ordinances making special emergency appropriations in a situation such as is here involved is to be found in N.J.S.A. 40A:4-53 which provides in pertinent part that:
A [municipality] may adopt an ordinance authorizing special emergency appropriations for the carrying out of any of the following purposes:
a. Preparation of an approved tax map.
b. Preparation and execution of a complete program of revaluation of real property for the use of the local assessor.
*274 The Legislature, whose function it is to declare public policy, particularly as it involves the fiscal affairs of municipalities, has made it clear that (except in situations not present in this case) municipal funds may not be disbursed for any purpose unless there has been a prior appropriation for that purpose.
So N.J.S.A. 40A:4-57 provides in pertinent part:
No officer, board, body or commission shall, during any fiscal year, expend any money * * *, incur any liability, or enter into any contract which by its terms involves the expenditure of money for any purpose for which no appropriation is provided, or in excess of the amount appropriated for such purpose.
Any contract made in violation hereof shall be null and void, and no moneys shall be paid thereon.
Further, N.J.S.A. 2A:135-5 makes such an expenditure a misdemeanor if done willfully and knowingly.
We are satisfied that a court may not  as the trial judge did here by authorizing seizure of moneys belonging to the municipality and ordering its application to payment of the cost of the revaluation and tax map contracts  ignore the legislatively declared public policy that an appropriation by the municipality's governing body precede any disbursement of municipal funds. In re Salaries of Probation Officer, Bergen Cty., 58 N.J. 422, 427 (1971); see also, Lyon v. Elizabeth, 43 N.J.L. 158 (Sup. Ct. 1881); Piscataway Tp. v. First Nat. Bank of Dunellen, 111 N.J.L. 412 (E. & A. 1933); cf. N.J.S.A. 54:4-43 and 44.
In In re Salaries of Probation Officers, Bergen Cty., supra, the Supreme Court, although affirming an order entered by the Bergen County Court judges granting retroactive salary increases to probation officers, acknowledged that an emergency appropriation by the county board of freeholders had to precede any payment of those increases, the court saying:
It is next argued that in voting to expend funds to meet the retroactive salary increases to which the judges agreed, the freeholders would violate the Local Budget Law, N.J.S.A. 40A:4-1 *275 et seq., which forbids the incurring of liabilities or the expenditure of money for which no appropriation has been made, N.J.S.A. 40A:4-57, and it would likewise violate N.J.S.A. 2A:135-5 which makes such action a misdemeanor. There would indeed be such violations were the Freeholders to meet the required payments without first making the necessary appropriation. Although no appropriation for this expense appeared in the regular budget, the matter can readily be handled by the adoption of an emergency appropriation pursuant to N.J.S.A. 40A:4-46 * * * [at 427; emphasis added]
The recalcitrance of members of the municipal council cannot justify ignoring the statutory mandate that there be an appropriation.[2] As we have shown above, the trial court has full power, if it but exercise it, to compel the required appropriation to be made.
One final comment  since this appeal does not challenge the court's order of January 20, 1975 authorizing the county board to contract for a revaluation and the preparation of a tax map, we need not resolve the validity of that order. We suggest, however, that it is more appropriate that the contracts for revaluation and preparation of a tax map be entered into by the city itself after the municipal council adopts the required appropriation ordinance and resolutions authorizing the execution of the contracts.
It is to be expected that the recalcitrant members of the municipal council, who still are subject to prosecution for criminal contempt for violation of the prior orders of the court, will not disregard any future orders. If they do, they *276 will subject themselves to further charges of criminal contempt as well as to commitment under R. 1:10-5 until the orders have been complied with. We add, that if such orders are disobeyed, there should be no delay in the institution of proceedings against those choosing to disobey them.
The order of March 10, 1975 is reversed and the cause remanded to the trial court for further proceedings consistent with this opinion. Costs on this appeal are awarded to the plaintiff Essex County Board of Taxation.
NOTES
[1] Indeed, it is to be noted, although we express no view as to its applicability to the recalcitrant defendants in this case, that N.J.S.A. 2A:135-1 provides:

A public officer who willfully refuses or neglects to perform any duty imposed upon him by law, is guilty of a misdemeanor.
See also, State v. Winne, 12 N.J. 152, 163-164 (1953); In re Messano, 16 N.J. 142, 148-149 (1954).
[2] So much of the order of March 10, 1975 as directed the State Treasurer to distribute the replacement revenues not to the city but instead to the county board is also of doubtful validity. The State Treasurer was not a party to this action nor, according to the record, was he served with notice of the application for the order. No order should have been entered against him until, by formal notice, he had been given an opportunity to be heard on the questions whether the court (1) had power to, and (2) should, direct him to make distribution of the replacement revenues in a manner other than that specified by the Legislature in N.J.S.A. 54:11D-5 and 6.