774 A.2d 655 (2001)
340 N.J. Super. 432
ESSEX COUNTY BOARD OF TAXATION, Plaintiff-Respondent/Cross-Appellant,
v.
CITY OF NEWARK, a municipal corporation of the State of New Jersey; Kenneth A. Gibson, Mayor of Newark; Earl Harris, Michael Bottone, Anthony Giuliano, Marie Villani, James Allen, Anthony Carrino, Henry Martinez, Donald Tucker, Individually and as members of the Municipal Council of Newark; and Frank D'Ascensio, City Clerk of Newark, Defendants-Appellants/Cross-Respondents, and
Sharpe James, Mayor of Newark, Defendant-Respondent,[1] and
John Grexa, Finance Director of Newark and Joseph Frisina, Tax Assessor of Newark, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 13, 2001.
Decided May 25, 2001.
*656 Leonard H. Berkeley, Parsippany, argued the cause for appellants/cross-respondents City of Newark, the Municipal Council of Newark and its members and the City Clerk (Weiner Lesniak, attorneys; Mr. Berkeley, of counsel, and Richard L. Rudin, David J. Reich and Paula J. Mercado, on the brief).
Julian F. Gorelli, Deputy Attorney General, argued the cause for respondent/cross-appellant (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Mr. Gorelli, on the brief).
Brown and Brown, Newark, for defendant-respondent Mayor Sharpe James (Raymond A. Brown and Alan Dexter Bowman, of counsel and on the brief).
Before Judges STERN, A.A. RODRIGUEZ and FALL.
The opinion of the court was delivered by FALL, J.A.D.
This is an appeal by the City of Newark, the members of its Council and certain of its fiscal officers from an order entered in the Law Division on October 5, 1999, directing them to undertake all steps necessary to complete and implement a municipal-wide revaluation, including entering into an approved revaluation contract on or before December 1, 1999; requiring the City and its tax assessor to provide the Division of Taxation (Division) with a corrected, revised and up-to-date tax map for approval pursuant to N.J.A.C. 18:12-4.7, on or before October 1, 1999; and upon their failure to perform these court-ordered actions, authorizing the Division to contract for revision of the City's tax map and for the revaluation and to fund the costs thereof through application of the City's entitlement to a share of taxes collected from banking corporations pursuant to N.J.S.A. 54:10A-33, from its share of replacement revenue from state-imposed Class II railroad taxes, pursuant to N.J.S.A. 54:29A-24.1 to -24.6, and from its entitlement to revenue-sharing funds pursuant to N.J.S.A. 54A:10-1 to -12.
The Essex County Board of Taxation (Tax Board) cross-appeals, seeking an amendment to the October 5, 1999 order, permitting the costs of completion of the tax map and revaluation to be funded by application of the City's entitlement to state aid from the Consolidated Municipal Property Tax Relief Aid (CMPTRA) fund.
The procedural background leading to this appeal is lengthy, beginning with the entry of an order by the Tax Board on March 1, 1972, approved by the Division on March 20, 1972, directing the City to implement a municipal-wide tax revaluation, to be implemented and effective for the tax year 1973. The basis of that order was the use by the City of "reproduction cost statistics without change from 1960[,]" and "that the revaluation figures as reflected in the tax duplicates filed in 1961 have not been kept current and revised accordingly[.]" The last property revaluation to be implemented in the City was in 1961, now forty years ago.
On March 18, 1974, when the City failed to comply with its revaluation order, the Tax Board filed a complaint in lieu of prerogative writs in the Law Division, seeking an order compelling the City to update its tax map and complete the revaluation, *657 to be effective for the tax year 1976.
On May 8, 1974, the Law Division entered an order directing the City to "comply immediately with [the Tax Board's] order of March 1, 1972." Specifically, the order directed the City to complete and effectuate the revaluation by October 1, 1975, to be effective for the tax year 1976. The trial court retained jurisdiction "for the purpose of obtaining compliance with this Order and ... to entertain an application for an extension of time if it appears probable that such an extension would be necessary."
On September 11, 1974, an order was entered in the Law Division, directing the City and its tax assessor to show cause why sanctions should not be imposed for failure to comply with the May 8, 1974 order. After a hearing on the order to show cause, the trial court entered an order on October 25, 1974, directing the City and its tax assessor to "comply immediately with the Court's Order of May 8, 1974." The order further directed the Council and its individual members, to "provide, by the enactment of appropriate ordinances, sufficient appropriations pursuant to the pending bid to fund the revaluation program of the City of Newark ordered by the Court... by November 4, 1974." The order also directed the City, its Council and officials to enter into a revaluation contract by November 4, 1974 and authorized the Attorney General to seek sanctions in the event of continued non-compliance.
On application of the Attorney General, an order was executed on November 13, 1974, permitting amendment of the complaint to name the Mayor, members of the Municipal Council, the City's Finance Director and City Clerk as individual defendants.
When the City and its officials failed to move forward with the revaluation as ordered, the trial court entered an order on December 12, 1974, directing defendants to show cause why the court should not authorize the Tax Board to proceed with the revaluation and update of the tax map at the cost of the City. After a hearing on the order to show cause, the trial court entered an order on January 20, 1975, authorizing the Tax Board to contract for the revaluation and preparation of an updated tax map. The order extended the effective date of the revaluation to the 1977 tax year and directed that the contract costs be the sole responsibility of the City.
On application of the Attorney General seeking specific approval of the method to fund the cost of the revaluation program, the trial court entered an order on March 10, 1975, authorizing the Tax Board to receive, from the State Treasurer, the City's share of replacement revenues distributable to the City pursuant to N.J.S.A. 54:11D-1 to -9, and to use such funds as the source for payment of completion of the revaluation and updated tax map.
Defendants appealed the March 10, 1975 order. In a reported decision issued on February 4, 1976, we reversed, holding that the order impermissibly resulted in the disbursement of municipal funds without a requisite prior appropriation by the City's governing body. Essex Cty. Bd. of Taxation v. Newark, 139 N.J.Super. 264, 274, 353 A.2d 535 (App.Div.1976). However, we noted that,
[S]ince this appeal does not challenge the court's order of January 20, 1975 authorizing the county board to contract for a revaluation and the preparation of a tax map, we need not resolve the validity of that order. We suggest, however, that it is more appropriate that the contracts for revaluation and preparation of a tax map be entered into by the city itself after the municipal council *658 adopts the required appropriation ordinance and resolutions authorizing the execution of the contracts.
[Id. at 275, 353 A.2d 535.]
We commented further that members of the governing body refusing to take the necessary steps to appropriate funds for the revaluation, "will subject themselves to further charges of criminal contempt as well as to commitment under R. 1:10-5 [now, R. 1:10-3] until the orders have been complied with." Id. at 275-76, 353 A.2d 535.
On April 1, 1976, the trial court entered an order directing the Council to enact an appropriation ordinance to fund the revaluation program. The Council failed to do so. Thereafter, the Attorney General moved for enforcement of the April 1, 1976 order. On June 7, 1976, the court entered an order committing the recalcitrant members of the City's Municipal Council to the Essex County Jail until such time as they complied with the April 1, 1976 order.[2] Defendants appealed from the June 7, 1976 order, which was reviewed by the Supreme Court on direct certification. The order of commitment was stayed pending that review.
The Court issued its opinion on March 31, 1977, stating, in pertinent part:
Such periodic revaluations are an absolute essential, particularly in times of continuous fluctuation of realty values, to accomplish the constitutional and statutory imperative of uniform and non-discriminatory taxation.
....
In granting certification herein, we stayed the order of commitment and invited argument by the parties on the appropriateness of a declaratory judgment by this court (a) declaring the validity of the remedy ordered by the Law Division in March 1975 or (b) adjudging that the expense of a revaluation to be ordered by the Board constitute[s] an obligation of the city equivalent to a judgment against it such that enforcement thereof might be had in the manner provided by N.J.S.A. 2A:17-72 and N.J.S.A. 54:4-43 and 44.
All parties now before us agree that it is preferable that the court adjudicate a means of executing the revaluation and providing for its payment without insisting upon incarceration of the councilmen as the sole means of achieving that result. While we do not condone the refusal of the defendant councilmen to comply with the law mandating periodic revaluations, we are in agreement with the Attorney General that the public interest in this matter urgently dictates resort to any valid recourse which will expeditiously accomplish the revaluation so long overdue and so essential to the proper assessment for taxation of all taxable property in the city. It is obvious that protraction of a contest of wills between the councilmen and the court is not the best way to achieve the desired result. Upon careful consideration of the matter, we are satisfied that the remedy invoked by Judge Margolis in March 1975 is legally correct and capable of achieving the desired objective.

In effect, the trial court in 1975 ordered a diversion to the Board, for financing of the revaluation, of tax revenues distributable by the State Treasurer to the city for its general purposes under N.J.S.A. 54:11D-1 et seq. The Appellate Division thought that the statutory prohibition of expenditure by municipalities of unappropriated *659 funds stood in the way of that recourse. N.J.S.A. 40A:4-1 et seq.; N.J.S.A. 40A:4-57. 139 N.J.Super. at 274-75, 353 A.2d 535. We think otherwise.
....
This is not a case of a municipality undertaking an expenditure not undergirded by an appropriation but rather a municipality refusing to make an expenditure which the law renders mandatory.
[Essex Cty. Bd. of Taxation v. Newark, 73 N.J. 69, 72-74, 372 A.2d 607 (1977) (citations and footnote omitted; emphasis added).]
Upon application for reconsideration, the Court entered the following order:
ORDERED that the funding of the contract of revaluation and ancillary work thereto is to be provided from funds distributable to the City of Newark under N.J.S.A. 54:29A-24.1 to 24.6, N.J.S.A. 54:10-1 et seq., and N.J.S.A. 54:10A-33.
[Id. at 76, 372 A.2d 607.]
On July 28, 1977, the trial court entered an order authorizing the Tax Board "to enter into a contract of revaluation and any work necessarily ancillary thereto for the City of Newark[,]" and to act "as the agent of the City of Newark." The order further directed, in pertinent part:
9. That the funding of the contract of revaluation and ancillary work thereto is to be provided to the Essex County Board of Taxation from funds distributable to the City of Newark under N.J.S.A. 54:29A-24.1 to 24.6, N.J.S.A. 54:10-1 et seq., and N.J.S.A. 54:10A-33 by the State Treasurer;
....
15. That this Court retain[s] jurisdiction of this matter for purposes of insuring compliance with the ordered relief.
In accordance with the July 28, 1977 order, the Tax Board entered into an agreement with PRC Jacobs, Inc. for performance of the revaluation. However, the revaluation was never completed due to a series of legislative enactments in response to the ordered property revaluation. See L. 1976, c. 58, eff. July 28, 1976 (prohibiting cities of the first class having a population in excess of 300,000 from entering into a contract for the general revaluation of real property for six months); L. 1980, c. 124, eff. October 16, 1980 (prohibiting the revaluation of real property in a city of the first class having a population in excess of 300,000 for the tax years 1981 to 1982, inclusive); L. 1982, c. 224, eff. December 31, 1982 (no city of the first class having a population in excess of 300,000 shall be required to implement a revaluation of real property for the first two months of 1983); L. 1983, c. 30, eff. January 26, 1983 (no city of the first class having a population in excess of 300,000 shall be required to implement a revaluation for the tax years 1983 to 1984, inclusive); L. 1985, c. 152, eff. April 25, 1985 (no city of the first class having a population in excess of 300,000 shall be required to implement a revaluation for the tax year 1985); L. 1985, c. 511, eff. January 21, 1986 (no city of the first class having a population in excess of 300,000 shall be required to implement a revaluation of real property for any tax year commencing or terminating within nine months after the completion of the final report of the Property Tax Assessment Study Commission); L. 1991, c. 112, eff. April 19, 1991 (no city which has not implemented a revaluation of real property since January 1, 1970 shall be required to implement a revaluation until January 1, 1992).
By letter dated July 12, 1993, the Tax Board advised the City's Tax Assessor to submit monthly progress reports on the *660 status of the revaluation. The Tax Board noted that "unless the [B]oard reconsiders the revaluation order and further receives approval for the same from the Director, the revaluation order is still in full effect."
In a progress report dated March 4, 1994, the City's Tax Assessor advised that the City would complete its tax maps in May 1994, approve a bonding ordinance for the revaluation in November 1994, and award a revaluation contract in December 1994. After those projected deadlines were not met, the Tax Board adopted a resolution on January 10, 1995, requesting the Attorney General initiate enforcement proceedings against the City seeking "the compliance, completion and implementation of a district-wide revaluation for the City of Newark[.]" By letter to counsel for the City dated September 24, 1996, the Attorney General advised:
This letter is to put the City on formal notice that, at the request, and on behalf, of the Essex County Board of Taxation, this Office intends to take legal action seeking to compel compliance with the outstanding revaluation orders if the City does not voluntarily comply. Please advise in writing by October 10, 1996 whether the City intends to comply. If we do not receive a written response by that date, we will file an application pursuant to R. 1:10-3.
Counsel for the City replied to the Attorney General by letter dated October 7, 1996, advising that the City "does not believe that revaluation would be proper until it has exhausted all avenues of bringing... previously untaxed properties onto the tax rolls so that they could be included in the revaluation[,]" and requested a meeting "for the purpose of perhaps negotiating some middle ground which would be satisfactory to the City Council as well as to the State of New Jersey." Further discussions between the parties took place without reaching a resolution.
In December 1997, the Governor appointed 25 individuals to the New Jersey Property Tax Commission. The Commission, with its membership consisting of academics, government officials and individuals from the business community, were charged "with recommending ways to help county, school and municipal officials ease the heavy burden of property taxes on New Jersey residents." Property Tax Commission "Report of Recommendations to Governor Christine Todd Whitman," p. 1, September 1998. In addition, "[t]he Commission sought to address both the cost of New Jersey's method of providing local government services as well as the state's historically heavy reliance on the property tax to fund these government services." Ibid.
The Commission recognized the problems at issue in the present matter by stating, in pertinent part:
Some municipal governments have forestalled long-overdue property revaluations because they fear the tremendous burden that may be placed on taxpayers who would suddenly face dramatically higher tax bills.
....
The Commission also recognizes that some New Jersey jurisdictions have not performed property valuations in decades, despite a Constitutional mandate to perform them yearly. This is largely due to local political and economic factors that have militated against comprehensive property revaluations in such municipalities. As a consequence, the property tax base in these jurisdictions is skewed. As more and more time passes and the imbalances remain uncorrected, the potential remedial action would appear to have ever more dramatic consequences, and revaluation is deferred *661 on that account. The result is an ever-spiraling inequity.
To date, New Jersey has had insufficient fiscal mechanisms in place to cushion the shock of revaluation.
[Id., Chapter V, p. 1.]
The Commission also recognized a "host of problems in the administration of the property tax in New Jersey." Ibid. These included, "a fragmented administrative structure with a concomitant blurring of accountability, failure to take full advantage of computer-aided mass property appraisal technologies, and difficulties in accurately valuing commercial and industrial property." Ibid.
As a means of combating these problems, the Commission recommended "a more centrally administered assessment system that would ensure regular adjustments in property values across the state[,]" and proposed "that the State establish a program to absorb, for a fixed period of time, property tax burden increases that are the result of municipal consolidation" by enacting "a State-funded program to phase in over three years the property tax increase directly resulting from revaluation." Id. at Chapter V, p. 2.
In the monthly report issued on April 29, 1998, the City's Tax Assessor listed an estimated completion date of July 1998 for resubmitting corrected tax maps to the Division, and an estimated completion date of December 1998 for forwarding a recommendation to the Council that it award a revaluation contract. Tax maps, which were submitted by the City to the Division for approval, were returned to the City for revisions and corrections on April 4, 1998, but were not resubmitted to the Division for approval. In a report issued by the Council dated May 7, 1998, entitled "Revaluation Update # 2," the Council stated its intent to "strongly resist revaluation."
On application by the Tax Board, the trial court issued an order on June 9, 1998, directing defendants to show cause on June 29, 1998, why the prior orders of the court directing submission of an updated tax map and completion of the revaluation should not be enforced.
The City opposed the Tax Board's application with the affidavit of Howard S. Lazarus, Director of Engineering of the City of Newark. Mr. Lazarus outlined the efforts taken by the City to complete revisions to the tax map and stated "the City has taken steps by contracting with companies and dedicating certain staff members to work on completion of the tax maps." With one exception, Mr. Lazarus further stated, "[i]t is the City's intention to resubmit these maps for review of the required comments [by the Division] and changes on August 15th [, 1998.]"
The City also filed a cross-motion, seeking an order dismissing the verified petition or, in the alternative, the vacation of the Tax Board's March 20, 1972 order, or a stay of the enforcement proceedings. The City submitted the supporting affidavit of its Tax Assessor, Evelyn E. Laccitiello, who stated, inter alia, that:
17. The changes made to real property assessments in the City of Newark as a result of demolitions, new construction and the large number of tax appeals has cast the conclusions reached by the Board in their 1972 Order in serious doubt as they relate to present conditions. In addition, changes in assessment procedure have made the Board[`]s conclusions inapplicable to the present situation. For example, new construction is placed on the assessment rolls using current reproduction costs.
....
19. On January 10, 1995, the Essex County Board of Taxation adopted a Resolution requesting that [its counsel] *662 undertake the requisite legal action to bring about compliance, completion and implementation of a district wide revaluation of the City of Newark. The reasons given for adopting this Resolution [are] that the Director's ratio is 16.21% for 1994 and that the City of Newark's general coefficient of deviation is 49.77% for 1994. These conclusions were reached without providing the City of Newark the opportunity to appear and refute the facts upon which they were based. In addition the County Board has adopted no Order approved by the Director of the Division of Taxation incorporating these findings and has therefore prevented the City of Newark from challenging said conclusions in the Tax Court.
Ms. Laccitiello further stated that the City awarded a contract to William Merdinger, MAI, CTA, to study the impact of a revaluation, and that Mr. Merdinger's May 1996 "report shows the devastating effect that a revaluation would have on residential property owners in the City." Mr. Merdinger's affidavit was also submitted by defendants, outlining what he characterized as the "dramatic" change in the residential tax burden that a revaluation would create, predicting that a revaluation would cause flight from the City and the erosion of its tax base.
The Tax Board's enforcement application and defendants' cross-motion were argued in the Law Division on February 11, 1999. It was noted by counsel for the Tax Board that the Division had conditionally approved the City's tax map for revaluation purposes, and "that the revaluation can proceed with the tax maps as they are with the understanding that the tax maps would be completed before the ... revaluation is completed." Accordingly, the Tax Board's application to the court was directed to the revaluation. In granting the Tax Board's application, and denying the City's cross-motion, the motion judge stated, in pertinent part:
The County Tax Board as agent to the city is responsible for seeing to the completion and implementation of the revaluation program for the earliest tax year possible. The funding of this contract is to be provided to the County Tax Board from funds distributable to the City of Newark by the State Treasury.
The revaluation was undertaken in accordance with this order, but was never implemented ... [b]ecause of a series of legislative moratorium[s] commencing with July 28th, 1976 through and including January 1, 1992. It is well to note that from 1982 to 1992 this moratorium legislation was permissive and would have permitted Newark to implement a revaluation had it chosen to do so, which it did not.
This is said because Newark could have implemented a revaluation, complete[d] it in 1981, to be effective for the tax year 1983, while the data was still fresh and useable. To this date, the City of Newark has failed to comply, both with the tax board's revaluation order and with the order that this Court entered on May 8, 1974. The last revaluation being some 37 years ago in 1961.
....
The defendants, still to date, have not submitted to the Division of Taxation for approval a contract of a revaluation firm for the completion and implementation of the court ordered revaluation of the City of Newark....
....
In the brief filed on behalf of the municipal council, [counsel] states that this action for relief under [R. 1:10-3] should be dismissed since the city has not willfully violated the court order and, in fact, completed a revaluation.

*663 And, further, states that the revaluation was never implemented because moratorium legislation was enacted by the Legislature from 1976 to 1992. It should be readily understood that there has been a willful failure to comply with this Court's prior order and the direction of the Supreme Court in 1977 because this Court and the Supreme Court expressly stated through its order of July 28, 1977 that the cost of the revaluation and any work necessarily ancillary thereto is to be the sole responsibility of the City of Newark. And that the County Board of Taxation, as agent of the city, is responsible for seeing to the completion and implementation of the revaluation for the earliest tax year possible.
And the language of this order was taken directly from the opinion of the New Jersey Supreme Court[.] ...
....
What the board seeks in this case is relief by application in the action and the board is entitled to the benefit of the rule unless the city can show that there is no entitlement to relief. The order of this Court based on the opinion of the Supreme Court remains viable to this day and the city has willfully failed to comply with the order in that opinion.
The city then make[s] the argument or at least makes the statement that the board should be required to file a new complaint in lieu of prerogative writ[s] to require the city to undertake a current revaluation. That is the very relief that the board seeks by way of this petition under [R. 1:10-3] and the filing of a new complaint would be a waste of time and activity.
This Court is not the "permanent revaluation supervisor" as the defendant argues in it brief. The Court is simply complying with the mandate of the Supreme Court which it is obliged to do.
....
What the city seeks by requiring the filing of a new complaint would be to further delay the revaluation and would not change the underlying issue in this enforcement proceeding. The sole issue before this Court is whether Newark has complied with this Court's order based upon the opinion of the Supreme Court. The defendants' failure to do so is recognized by the Supreme Court in its opinion.
....
It is true that the property tax commission was appointed by Governor Whitman and reported [its] recommendations to her in September of 1998. Those recommendations have not in any way been adopted as to the State. It is also true that there is a Bill before the Legislature by Assemblyman Tucker seeking certain phases in revaluation. It is further true that while the commission reports have been submitted in September 1998 and the Bill before the Legislature has been submitted in the year 1998, the commission reports have not been acted upon nor has the Legislature at this writing taken any action with respect to any of the Bills presently pending here.
....
On balance, considering the equities of the situation, and taking into consideration the opinion of the Supreme Court, the earliest tax year for the revaluation would militate toward a stay of up to six months to allow the Legislature time to consider the commission report and any bill pending before it and determine just how the city shall revalue its property.
An order was executed on March 5, 1999, granting the Tax Board's application and denying the City's cross-motion. In its order, the trial court granted a stay to the City of up to six months to allow the *664 Legislature to consider and act on the Property Tax Commission's recommendations and pending legislation, with the parties to appear before the court on September 7, 1999.
As required, the parties appeared before the court on September 7, 1999 for further argument. Counsel for the City outlined numerous remedial legislative efforts and requested that the stay contained in the March 5, 1999 order be extended for an additional six-month period to allow for further action by the Legislature on pending bills. The judge reviewed the action taken by the Legislature and the proposed bills before it stating, in pertinent part:
[T]hese proposals, and that's what they are, do little to change what the Supreme Court said in its opinion in this case ... in which it said that the equities of the situation are that the earliest tax year for revaluation should be considered....
If you take the opinion of the Supreme Court in the case that we have before us now and measure it against [Switz v. Township of Middletown, 23 N.J. 580, 130 A.2d 15 (1957) ], the present Supreme Court opinion would have to govern and the revaluation must commence.
On October 5, 1999, the trial court entered an order discharging the stay, and requiring the City to provide the Division with a corrected, revised and up-to-date tax map on or before November 1, 1999, and to appropriate sufficient funds and enter into an approved revaluation contract on or before December 1, 1999. Upon the City's failure to do so, the order provided for the Division to contract, either to secure an up-to-date tax map or for the performance of the revaluation, or both. In the event it is necessary for the Division to contract to do so, the necessary funds are to be provided from funds distributable by the State to the City pursuant to N.J.S.A. 54:10-1, et seq., N.J.S.A. 54:10A-33, and N.J.S.A. 54:29A-24.1 to 24.6.
The proposed form of order submitted to the court by the Attorney General's Office had included a request for inclusion in the order of the City's entitlement to CMPTRA funds as a source of payment of the costs of both the updating of the tax maps and revaluation. Counsel for the City objected, on the basis that neither the rulings made by the trial court at the September 7, 1999 hearing, nor the Supreme Court's March 31, 1977 order that was being enforced, provided for the use of CMPTRA funds as a source for payment of the costs of the revaluation or updating of the tax maps. The October 5, 1999 order did not permit the use of CMPTRA funds for these purposes.
On November 23, 1999, we entered an order, denying the City's application for a stay. It appears the City did not seek a stay from the Supreme Court pursuant to R. 2:9-5(b). On July 5, 2000, we granted the application of Sharpe James, Mayor of Newark, to file a respondent brief, nunc pro tunc.
On appeal, the City presents the following arguments for our consideration:
POINT I
THE TRIAL COURT ERRED IN ALLOWING THE COUNTY BOARD TO DISREGARD PROPER PROCEDURE.
POINT II
THE COURT BELOW ERRED IN NOT DELAYING REVALUATION IN ORDER TO GIVE THE LEGISLATIVE AND EXECUTIVE BRANCHES SUFFICIENT OPPORTUNITY TO ACT.
On its cross-appeal, the Tax Board argues:
THE COURT BELOW ERRONEOUSLY LIMITED THE FUNDING OF *665 THE REVALUATION TO SOURCES OF STATE AID INSUFFICIENT TO COVER THE COST, CONTRARY TO THE INTENT AND SPIRIT OF THE SUPREME COURT'S REMAND.
I
The City argues that in ordering the revaluation, the Tax Board failed to follow the required procedures, as outlined in N.J.A.C. 18:12A-1.14(b)(1)(i)(x), and failed to gain approval from the Director of the Division of Taxation before the passage of its 1995 resolution, pursuant to N.J.A.C. 18:12A-1.14(a).
Our review of the record discloses that this argument is clearly without merit and does not warrant extensive discussion in this opinion. R. 2:11-3(e)(1)(E). On this issue, we are substantially in agreement with the reasons for entry of the March 5, 1999 and October 5, 1999 orders as articulated by Judge Harry A. Margolis in his oral opinions delivered on February 11, 1999 and September 7, 1999. We note the following.
The resolution adopted by the Tax Board on January 10, 1995, specifically notes that "the City of Newark ha[d] been previously ordered to complete and implement a district-wide revaluation[.]" Moreover, the resolution states the Tax Board had consulted with the Attorney General's Office "regarding the enforcement of the Tax Board's previous order for revaluation as it pertains to the City of Newark[.]" It is clear that the 1995 resolution was not a new order of revaluation, but rather constitutes a logical step in the procedure to enforce the March 1, 1972 revaluation order, which the City failed to comply with. Accordingly, there was no requirement that the Tax Board follow the procedures outlined in N.J.A.C. 18:12A-1.14 (b)(1)(i)(x), or seek further approval from the Division.

II
Citing to Switz v. Middletown Tp., 23 N.J. 580, 130 A.2d 15 (1957), the City further argues that the trial court erred by refusing to further delay implementation of the provisions of the October 5, 1999 order directing the revaluation process to commence, to allow the Legislature to further act on revaluation issues. This argument is also clearly without merit and does not require extensive discussion. See R. 2:11-3(e)(1)(E).
In Switz, supra, the trial court entertained an action by a property owner "to compel assessment of all realty in [the] township at full and fair value and to compel equalization of all assessments in [the] county at such value as required by statutes." 23 N.J. at 580, 130 A.2d 15. The trial court granted plaintiff the relief sought and the township and its tax assessor appealed. Ibid. We affirmed in part and reversed in part, Switz v. Middletown Tp., 40 N.J.Super. 217, 122 A.2d 649 (App. Div.1956), and the Supreme Court granted certification. 22 N.J. 222, 125 A.2d 234 (1956).
Recognizing the harsh consequences that the act of assessment at true value may have on the public, and that the Legislature recognized the concern and had committed to acting on it, the Court held:
The inquiry as to true value shall proceed, but the mandate otherwise shall not apply to the tax years 1957 and 1958, thereby to afford the Legislature the opportunity to take such measures and provide for such administrative procedures as its own inquiry may prove to be essential to the public interest, and to allow the Township time needed for the fulfillment of the project.
[Switz, supra, 23 N.J. at 598, 130 A.2d 15.]
*666 As in Switz, this case focuses on issues of great concern to the public as revaluation could have significant economic implications for people who reside in the City. However, despite a constitutional mandate and a Supreme Court order, it has been forty years since the City revalued its property. In recognition of the impact of revaluation, the trial court delayed implementation of its order in 1999 for a period of six months, in contemplation of action by the Legislature. However, since the passage of the "Revaluation Relief Act of 1999," L. 1999, c. 216, §§ 1, 2, 10-12, eff. September 21, 1999, codified as N.J.S.A. 54:1-35.51 to -35.55, and amendments to the "Revaluation Relief Act of 1993," N.J.S.A. 54:1-35.39 to -35.50, L. 1999, c. 216, §§ 3-9, eff. September 21, 1999, permitting the phase-in of revaluations over a period of five years to mitigate the anticipated "fiscal shock," we have been presented with nothing indicating that further legislative action is imminent or even probable in the reasonably foreseeable future. It has been forty years since the City's last revaluation and more than twenty-four years since the Supreme Court ordered the method for funding the City's revaluation, enforced by the trial court in its October 5, 1999 order. We find no abuse of discretion by the trial court in rejecting the City's request for an additional stay of the implementation of the revaluation order. Moreover, as in Switz, the inquiry as to true value can proceed and the Legislature can take action to effect its result.

III
In its cross-appeal, the Tax Board argues that of the three funds from which the trial court authorized the diversion of funds from in order to fund the revaluation, as contained in the October 5, 1999 order, two are no longer legislatively funded in their original form. The Tax Board contends that the single remaining fund is insufficient to cover the anticipated costs of the revaluation, contrary to the intent of the Supreme Court's order issued on March 31, 1977. See Essex Cty Bd. of Taxation v. Newark, 73 N.J. at 76, 372 A.2d 607 (1977).
One of the funding sources ordered by the trial court and approved by the Supreme Court is "replacement revenue to municipalities," pursuant to N.J.S.A. 54:29A-24.1 to 24.6, designed to compensate municipalities for revenue lost due to the uniform state taxation of railroad property. The Tax Board notes that, beginning with fiscal year 1995-96, railroad property tax replacement revenues were included within the CMPTRA funds provided each fiscal year to municipalities.[3] This was the result of the consolidation of various state aid programs into one fund, now known as CMPTRA, beginning with the fiscal year 1996 annual appropriations act. See L. 1995, c. 164.
The Tax Board contends that unless this court authorizes the Division to apply CMPTRA monies due the City to pay for the revaluation costs, railroad replacement revenue would not be available as a funding source, as originally intended in the March 31, 1977 order of the Supreme Court. See Essex Cty. Bd. of Taxation, supra, 73 N.J. at 76, 372 A.2d 607. Stated another way, railroad replacement revenue, previously separately funded in accordance with N.J.S.A. 54:29A-24.1 to -24.6, is now encompassed within the City's entitlement to CMPTRA funds.
The Tax Board also notes that funding the revaluation through application of the City's entitlement to revenues collected *667 from banking corporations, pursuant to N.J.S.A. 54:10A-33, is not possible because that source of aid is not currently being funded.[4]
The third funding source contained in the October 5, 1999 order, the "State Revenue Sharing Act of 1976," N.J.S.A. 54A:10-1 to -12, involves senior citizen and veterans' deduction replacement revenues. The Tax Board argues this funding source "is insufficient to reimburse [the Division] fully for the anticipated cost of the revaluation project[,]" stating that for fiscal year 1999-2000, revenue distributable to the City pursuant to that source "was approximately $450,000[,]" and that "[e]ven with the phased-in increase of the veterans deduction authorized under N.J. Const. [A]rt. 8 § 1, ¶ 3, as amended by ACR29, [the Division] could not hope to recoup the cost of revaluation for several years after completion of and payment for the project." The cost of the revaluation is estimated to be approximately $6.2 million over a three-year period.[5] The Tax Board further asserts that "[f]or FY 1999-2000, approximately $55 million was appropriated for distribution to Newark under CMPTRA."
The City contends that by designating the three funding sources contained in its March 31, 1977 order, "the Supreme Court made a conscious decision that only certain specific designated State funding sources should be withheld[,]" and that in 1977 "Newark had other State funding sources that were not made subject to the Supreme Court's decision."
Our review of the City's certified audit for 1977, contained in the record as supplemented, discloses that the three funding sources designated in the Court's March 31, 1977 order generated in excess of $4 million in state aid revenue to the City during 1977. Although the City had other sources of State aid in 1977 that were not designated in the Court's March 31, 1977 order, the three funds that were designated would have been sufficient, prior to the creation of CMPTRA, to adequately fund the costs for the revaluation and up-dating of the tax map at that time. However, due to subsequent revisions by the Legislature to the methods by which State aid is distributed to municipalities, the sources designated by the March 31, 1977 order are now either no longer funded, have been incorporated under CMPTRA, or are presently inadequate to fulfill the mandate contained in the Court's order.
Based on our careful review of the history of this case, we conclude that the intent of the Supreme Court order entered on March 31, 1977 was to provide a source of funds from which the costs of the ordered revaluation could be paid. It is undisputed that due to changes in the methods of providing State aid to municipalities, those funding sources designated by the Supreme Court, although once adequate to fund "the contract of revaluation and ancillary work thereto[,]" are now insufficient to do so. Moreover, the record discloses that the City was distributed $54,802,471.35 in CMPTRA funds during fiscal year 1999-2000. Accordingly, in order to effectuate the intent of the Court's order that State aid due to the City be diverted to fund the costs of the revaluation contract, we direct that paragraphs 5 and 10 of the October 5, 1999 order be modified to require that the costs incurred by the Division in updating the tax map and to pay for the property revaluation of the City shall be paid from State aid funds distributable to the City under N.J.S.A. *668 54A:10-1 to -12, and the Consolidated Municipal Property Tax Relief Aid (CMPTRA) fund.
We affirm the October 5, 1999 order, as modified, and remand for entry of a modified order consistent herewith. We do not retain jurisdiction.
NOTES
[1] Although listed as a member of the Municipal Council in the initial caption, Sharpe James was subsequently elected Mayor of Newark and, by order entered on July 5, 2000, was granted leave to file a respondent brief, as Mayor.
[2] The Municipal Council members ordered to be incarcerated were Councilmen Anthony Carrino, Sharpe James, Henry Martinez, Donald Tucker, and Councilwoman Marie Villani.
[3] This assertion by the Tax Board, supported by the Appropriations Handbook for years 1995-95 and 1999-2000, is not disputed by the City.
[4] The Tax Board submits no authority to support this assertion; however, the City does not dispute same to be the case.
[5] This assertion by the Tax Board is not disputed by the City.